UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————— X

ALINA KOLESNIKOW,                                    Case No. 05-9858 (SCR)(GAY)

        Plaintiff,

        v.                                          **SECOND AMENDED
COMPLAINT
AND JURY DEMAND**

HUDSON VALLEY HOSPITAL CENTER and
CATHERINE MCNAMARA,

        Defendants.

-------------------------------------------------- X

Plaintiff, Alina Kolesnikow, by and through her attorney, Andrew S. Baron LLC, and for her

Second Amended Complaint, alleges as follows:

## INTRODUCTION

    1.    In this action, plaintiff Alina Kolesnikow ("Plaintiff" or "Ms. Kolesnikow"), a

former employee of Hudson Valley Hospital Center ("HVHC" or the "Hospital"), alleges that

HVHC discriminated against her based on her age and national origin. In addition, Plaintiff

alleges that one of her former supervisors, Catherine McNamara ("Ms. McNamara," and together

with HVHC, the "Defendants") committed assault and battery upon her, and that Defendants

inflicted emotional distress upon her. Moreover, HVHC failed to pay Plaintiff overtime despite

the fact that she often worked more than 40 hours per week, and did not pay Plaintiff accrued

and unused sick and vacation time upon her termination. This action is brought pursuant to Title

VII of the Civil Rights of Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.* ("Title VII"), the

Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), the Fair Labor

Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), and Articles 6 and 19 of the New York Labor

Law (the "Labor Law"). In addition, Plaintiff asserts common law causes of action for the

assault and battery and intentional infliction of emotional distress.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 29 U.S.C. § 626(c) and 42 U.S.C. §§2000e-5(f)(3).  Jurisdiction as to the common law claims and the claims under the Labor Law are conferred upon this Court by and under the principals of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

3.     The parties to this action reside in and/or regularly do business within the jurisdiction of this Court.  A majority of the events at issue in this action took place within the jurisdiction of this Court.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), and 42 U.S.C. 2000(e)-5(f)(3).

## PARTIES

4.     Ms. Kolesnikow is of Polish national origin and a resident of the County of Westchester, New York.  She is 57 years old (date of birth: 12/26/48).

5.     HVHC is a not-for-profit hospital located at 1980 Crompond Road, Cortlandt Manor, County of Westchester, New York.  HVHC employs more than 500 employees.

6.     Ms. McNamara is the Clinical Nurse Manager for HVHC.

## PROCEDURAL BACKGROUND

7.     On September 15, 2004, Ms. Kolesnikow filed a timely Verified Complaint with the New York State Division of Human Rights ("SDHR") alleging national origin and age discrimination in both the terms and conditions of her employment with HVHC and the termination thereof. (See Exhibit A.)

8.     On September 2, 2005, the U.S. Equal Employment Opportunity Commission issued Plaintiff a Notice of Right to Sue. (See Exhibit B.)

9.      Thereafter, on November 22, 2005, Plaintiff filed a *pro se* Complaint, which she subsequently amended on November 28, 2005.  The Amended Complaint alleges national origin and age discrimination under Title VII and the ADEA.

## FACTS

10.     On or about September 9, 2002, Ms. Kolesnikow commenced employment with HVHC as a part-time certified nursing assistant ("CNA") in HVHC's Brillinger department, where she was responsible for caring for cardiac and pediatric patients.

11.     Throughout her employment, Ms. Kolesnikow was the only CNA of Polish national origin employed in the Brillinger department.

12.     Further, at the time of her termination, Plaintiff was one of the oldest CNA's employed in the Brillinger department.  Following Plaintiff's termination, the average age of all CNA's in the Brillinger department was approximately 38 years -- 17 years younger than Plaintiff.

13.     In or about March of 2003, HVHC promoted Ms. Kolesnikow to a full-time position.

14.     In her full-time position, Ms. Kolesnikow worked a 12-hour shift from 7 a.m. to 7 p.m. three to four days per week.

15.     On occasion, Plaintiff, at HVHC's request, volunteered to extend her shift from 12 to 16 hours to cover absent employees.

16.     Though Ms. Kolesnikow was a non-exempt employee who often worked more than 40 hours per week, throughout her employment with HVHC, the Hospital did not compensate her at a rate of time-and-a-half her regular rate of pay for hours worked over 40 in a week.

17.    Instead, HVHC paid only her regular rate of pay for hours worked over 40 in one week.

18.    At one point, Ms. Kolesnikow inquired about the Hospital's overtime policy, and HVHC confirmed that it only paid the regular rate of pay to CNA's for hours worked over 40 in one week.

19.    HVHC failed to properly pay overtime despite its own internal policy that provides "when overtime is warranted, the employee will be paid in accordance with the provisions of the Fair Labor Standards Act."

20.    As with all other CNA's employed at HVHC, Ms. Kolesnikow was responsible for administering direct patient care as assigned by a Charge Nurse.

21.    Such duties included assisting patients with hygiene needs, changing bed linens, carrying special orders as directed by the Charge Nurse, providing patients and family members with encouragement and support, reporting a patient's condition to the Charge Nurse, maintaining current documentation of a patient's status, answering patient's call lights (whether that of an assigned patient or not), assisting other staff in completion of their duties, and maintaining a patient's room in a neat, orderly and safe manner.

22.    Ms. Kolesnikow always performed her duties in a conscientious manner.

23.    Throughout her employment, HVHC rated Ms. Kolesnikow's performance as meeting or exceeding expectations.

24.    For example, Plaintiff's August 2003 performance appraisal notes that Plaintiff "works well with other staff and is helpful to all."

25.    In addition, patients and their families would often commend Ms. Kolesnikow on the level of care she provided and would send her cards and flowers thanking her for her hard work.

4

26.     Despite her excellent performance, HVHC treated Ms. Kolesnikow in a discriminatory manner based on her national origin and age.

27.     HVHC would often assign Ms. Kolesnikow the most difficult patients or assign her to significantly more patients than other CNA's in the Brillinger unit -- often without the requisite help or support.

28.     In contrast, HVHC would assign younger, non-Polish CNA's to less burdensome assignments.

29.     In addition, HVHC often scheduled her to work three days in a row, while it did not do so for other similarly situated non-Polish and younger CNA's.

30.     In or about September 2002, Plaintiff attended a CPR training session provided by a nurse from HVHC.

31.     At the end of the training session, the instructor told Ms. Kolesnikow and others in attendance that if they knew of any young girls who wanted to work at the hospital, they should inform HVHC because it wanted to train and educate them.

32.     Moreover, Hospital employees would often comment on Ms. Kolesnikow's accent and would ask her what country she was from.

33.     The Hospital further discriminated against Ms. Kolesnikow based on her age and national origin by falsely accusing her of misconduct, disciplining her for such misconduct, and ultimately terminating her.  Upon information and belief, the Hospital did not subject non-Polish and younger similarly situated employees to the same mistreatment.

34.     In or about August 2003, HVHC stated in a written memorandum that Plaintiff allegedly provided false information to a patient's family, but never discussed this allegation with Plaintiff.

35.    There was an incident where a patient's family asked Ms. Kolesnikow why the patient had not yet received a particular medication. Ms. Kolesnikow inquired with the nurse assigned to the patient, named "Melissa," who told Plaintiff to inform the family that the Hospital pharmacy had not yet delivered the medicine. Ms. Kolesnikow did as she was told, but unbeknownst to her at the time, the statement that the pharmacy had not yet delivered the medication was a fabrication.

36.    The Hospital also falsely stated in an internal memorandum that Plaintiff had been argumentative with a nurse in front of a patient. In that case, the Plaintiff did not argue with the nurse. In fact, the nurse had abandoned Plaintiff to assist an obese patient with her bed pan.

37.    In another incident in or about August 2003, the Hospital accused Ms. Kolesnikow of falsely reporting that a nurse had improperly thrown away blood.

38.    Ms. Kolesnikow never made this accusation and informed the Hospital of that fact.

39.    Nevertheless, the Hospital verbally reprimanded Plaintiff. HVHC also later created a written warning regarding this alleged incident, but never presented such warning to Plaintiff while she was employed with the Hospital.

40.    In addition, in that written warning, the Hospital claims that it held a meeting with Plaintiff on August 21, 2003 to discuss Plaintiff's alleged accusation. To the best of Plaintiff's recollection, this meeting never took place.

41.    In or about November 2003, HVHC falsely claimed that Plaintiff failed to check with a nurse whether a patient was allowed to eat.

42.    However, upon information and belief, it was the Hospital that negligently failed to note on the patient's records that he was not allowed to eat.

43.    As a result, the Hospital delivered food to the patient.

6

44.    Ms. Kolesnikow discovered the food in the patient's room and became concerned because she thought the patient was supposed to be scheduled for surgery at 7:30 a.m.

45.    Plaintiff, who was given a double assignment that day because another CNA did not arrive for work, attempted to contact the assigned nurse several times over a period of three hours to check whether the patient was permitted to eat. Unfortunately, Plaintiff could not locate her.

46.    Plaintiff inquired with the Head Nurse, named "Ann," about the whereabouts of the assigned nurse. Ann informed Plaintiff to wait 10-15 minutes for the Charge Nurse to arrive, but she never did.

47.    Ms. Kolesnikow also instructed the patient to use the call light to call the nurses' station to verify whether he could eat. The patient did so, but no one from the nurses' station ever answered his call.

48.    As the day wore on, the patient continued to inquire whether he could eat. Because there was no documentation on the patient's records that he could not eat, and because no one from HVHC told Plaintiff that the patient could not eat (despite her numerous inquiries), Plaintiff informed the patient that he could do so.

49.    Further, by the time the patient did eat, it was well after the scheduled 7:30 a.m. time of his surgery. Additionally, it was so late in the day that it was beyond the time the Hospital would normally reschedule a surgery.

50.    Ultimately, the Hospital determined that the patient should not have eaten and issued Ms. Kolesnikow a written warning (but never provided her a copy) and suspended her for that day and two additional days.

51.    In that written warning, HVHC erroneously claims that Ms. Kolesnikow failed to inquire whether the patient could eat.

52.     The Hospital made this determination without ever questioning Ms. Kolesnikow.

53.     During a meeting with Karen Keeler ("Ms. Keeler"), HVHC's Director of Nursing, Ms. Kolesnikow offered to tell her perspective on the events.

54.     Ms. Keeler flatly responded that the Hospital would perform its own investigation, and she refused to accept any statement from Ms. Kolesnikow.

55.     Further, the Hospital demanded that Ms. Kolesnikow sign the written warning, but she initially refused because the allegations contained in the written warning were not true.

56.     Ms. Keeler informed the Plaintiff that she had to sign the written warning or the Hospital would terminate her employment.

57.     Despite her reservations, but feeling she had no other recourse, Ms. Kolesnikow signed the written warning.

58.     In an internal memorandum, the Hospital also falsely accuses Plaintiff of delivering the food to the patient. However, as the Hospital is aware, CNA's do not have the authority to order food for a patient (only the nurse assigned to the patient could order the food), and it was the Hospital's own food service staff that delivered the food.

59.     In or about May of 2004, the Hospital wrongly accused Plaintiff of making racial slurs about "blacks being lazy."

60.     This alleged statement was reported in a written letter by another employee, Johanna Walker, who is black. Ms. Kolesnikow never made this statement. Moreover, after HVHC terminated Plaintiff, Ms. Walker told Plaintiff that she was pressured to submit the written letter.

61.     Ms. Kolesnikow did ask another CNA, Bonnie St. John -- who had often questioned Plaintiff about her national origin -- whether her husband was black. Plaintiff did not intend for this question to insult Ms. St. John. Nor did she ask the question with any racial

8

animus.  Rather, she asked it in a conversational manner.  At the time, Ms. St. John did not object to Plaintiff's question and answered her in a friendly tone.

62.     Later, however, Ms. St. John, at the Hospital's request, provided a written statement regarding her conversation with Ms. Kolesnikow.  In that statement, she falsely accuses Ms. Kolesnikow of stating "how could you marry a black man."  Ms. Kolesnikow, however, never made such a statement.

63.     As a result of these allegations, the Hospital suspended Ms. Kolesnikow without pay on or about May 3, 2004 and for two additional days.  Further, the Hospital forced Plaintiff to take an additional day off using her vacation time.

64.     It also issued her a two-page written warning, but never provided her a copy.  The written warning falsely accuses Ms. Kolesnikow of stating that, in Poland, relationships with black people are considered "shameful."

65.     Moreover, the Hospital demanded that Ms. Kolesnikow sign the written warning, but did not let her review the first page, which contained the substance of the allegations.  Based on Ms. Keeler previously telling Plaintiff that the Hospital would terminate her if she did not sign the written warning, Plaintiff did so, but never saw the substantive contents of the warning until after she was terminated.

66.     In another incident, the Hospital wrongly alleged that the Plaintiff had altered a patient's medical records concerning the time of a check of a diabetic patient's blood sugar levels (referred to as an "Accu-Check").

67.     The Accu-Check is a simple non-painful finger prick where a minute amount of blood is collected to check a patient's blood sugar levels.  It is generally performed before or after a patient eats.

68.     The Hospital is supposed to note the time of a patient's Accu-Check on a computer printout.  However, HVHC nurses told Plaintiff that she should not trust those printouts because they were often incorrect.

69.     With respect to the patient at issue, the routine had been to perform the Accu-Check at 4 p.m., but the computer printout for that day stated that Accu-Check should be performed at 6 p.m.

70.     Plaintiff could not locate the nurse assigned to that patient to verify the time of the Accu-Check.  Since she was concerned with the patient's health and mindful of being told not to trust the listed time for an Accu-Check, Plaintiff performed it at 4 p.m.  Plaintiff noted this on the patient's records.

71.     Plaintiff also performed the Accu-Check knowing that if 4 p.m. was the incorrect time, the Accu-Check could be performed again at 6 p.m. without any harm to the patient.

72.     When the nurse assigned to that patient arrived at 5 p.m., Ms. Kolesnikow informed her that she had performed the Accu-Check at 4 p.m. and told the nurse of the 6 p.m. time noted in the patient's records.  Plaintiff also followed-up with another CNA to verify that an Accu-Check was done at 6 p.m.

73.     Though Plaintiff only noted in the patient's records the time that she performed the Accu-Check, the Hospital accused her of altering those records and reprimanded her.

74.     At other times, nurses failed to leave follow-up instruction on patient care.  On one occasion, a nurse failed to note that Ms. Kolesnikow should collect a patient's urine.  The Hospital later accused Ms. Kolesnikow of failing to collect the urine because she did not understand English.  It did so despite the fact that Plaintiff is fluent in English and it was the nurse who forgot to instruct Plaintiff to collect the urine.

10

75.   HVHC's discrimination of Plaintiff culminated in August of 2004 when it terminated her for placing a food tray on the floor of a patient's room.

76.   On or about August 1, 2004, HVHC assigned Ms. Kolesnikow to a patient who had a gastric tube placed in her mouth.  The Hospital told Plaintiff to watch the patient to make sure that she did not remove the tube.

77.   At the end of her shift, HVHC asked Plaintiff if she could watch the patient the following day.  Plaintiff agreed to do so.

78.   The Hospital also informed Plaintiff that state inspectors would be inspecting the Hospital that day and that it was important to keep the patient's room clean.

79.   After arriving at work at 7 a.m. on August 2, 2004, Ms. Kolesnikow proceeded to the patient's room to watch her.

80.   At some point during the morning, the Hospital delivered food to the patient. After a couple of hours, no one from the Hospital food service staff had picked up the tray from the room.  After a while, the food began to smell and Ms. Kolesnikow wanted to remove the tray and food to maintain the cleanliness of the room.

81.   Ms. Kolesnikow picked up the tray and proceeded to the doorway -- but did not leave the room.  She saw a food service employee in the hallway and asked that individual to remove the tray.  That food service employee refused to help, claiming that her food cart was full of trays and she did not have any more room on the cart to place the tray.  Ms. Kolesnikow then asked a nurse and other co-workers to remove the tray, but they refused to assist her.

82.   As Ms. Kolesnikow was standing in the door trying to get someone to help her, the patient began gagging on her gastric tube.  Ms. Kolesnikow temporarily placed the tray on the floor to attend to the situation.

11

83.     The food service employee who had initially refused to take the tray reported to Ms. McNamara that Plaintiff placed the tray on the floor.

84.     Ms. McNamara came to the patient's room, grabbed Ms. Kolesnikow and pushed her into an unlit bathroom.

85.     Ms. Kolesnikow immediately feared for her safety and turned the light on.  Ms. McNamara screamed at Plaintiff "what are you doing."  Ms. McNamara then told Plaintiff that she could not leave the room unless another Hospital employee was present.

86.     Shortly thereafter, a co-worker, Ruth Faras, came to the patient's room.  Plaintiff, who was shaken up by Ms. McNamara grabbing, pushing and yelling at her, asked Ms. Faras if she could stay in the room for a few minutes to watch the patient.  Ms. Faras agreed.

87.     Ms. Kolesnikow then left the room for a few minutes to calm down, use the bathroom and get a cup of coffee.  On her way back to the room, Ms. McNamara saw Plaintiff and questioned her why she had left the room.  Ms. Kolesnikow informed Ms. McNamara that another CNA was in the room watching the patient.  Plaintiff immediately went back to the patient's room.

88.     Upon information and belief, Ms. McNamara never checked to see if another CNA was in the room to watch the patient.

89.     In an internal memorandum, Ms. McNamara noted that Plaintiff was asked to sit with the patient, which Ms. McNamara described as "confused."  Later, the Hospital claimed that the patient in question needed to be supervised because she was suicidal.  However, neither Ms. McNamara nor any other Hospital employee ever informed the Plaintiff that the patient was suicidal until after Plaintiff was terminated.

12

90.     Approximately 10 days later, the Hospital terminated the Plaintiff for placing the food tray on the floor.  Ms. Keeler notified the Plaintiff that she was terminated and told her that she did not "fit" with HVHC.

91.     The Hospital never paid to Ms. Kolesnikow unused sick and vacation time that she had accrued prior to her termination.

92.     The weekend after her termination, Plaintiff visited the Hospital because she wanted to check if the Hospital had paid her all compensation due.

93.     When she arrived at the Hospital, she spoke to a registered nurse and informed her that she had been terminated.

94.     That individual told Plaintiff that the Hospital does not like older employees and that it had tried to accuse her of negligence.  That individual also commented that the Hospital mad her "suffer" and tried to "humiliate" her.

95.     As a result of Defendants' conduct, Plaintiff suffered and continues to suffer economic losses, mental anguish, pain and suffering, and other nonpecuniary losses.

### FIRST CAUSE OF ACTION
### Title VII

96.     Plaintiff realleges and incorporates by reference paragraphs 1 through 95 of the Second Amended Complaint as if fully stated herein.

97.     By the above enumerated acts, HVHC willfully discriminated against Plaintiff because of her national origin in the terms, conditions and privileges of her employment in violation of Title VII, 42 U.S.C. Section 2000e-2.

### SECOND CAUSE OF ACTION
### ADEA

98.     Plaintiff realleges and incorporates by reference paragraphs 1 through 97 of the Second Amended Complaint as if fully stated herein.

99.     By the above enumerated acts, HVHC willfully discriminated against Plaintiff because of her age in the terms, conditions and privileges of her employment in violation of the ADEA, 29 U.S.C. § 623.

### THIRD CAUSE OF ACTION
### FLSA

100.   Plaintiff realleges and incorporates by reference paragraphs 1 through 99 of the Second Amended Complaint as if fully stated herein.

101.   HVHC knew or recklessly disregarded its obligations under the FLSA, and willfully failed to pay to Plaintiff overtime compensation at the rate of one-and-a-half times Plaintiff's regular hourly wage for hours that Plaintiff worked over 40 in one week in violation of the FLSA.

### FOURTH CAUSE OF ACTION
### Labor Law

102.   Plaintiff realleges and incorporates by reference paragraphs 1 through 101 of the Second Amended Complaint as if fully stated herein.

103.   HVHC knew or recklessly disregarded its obligations under the Labor Law, and willfully failed to pay to Plaintiff overtime compensation at the rate of one-and-a-half times Plaintiff's regular hourly wage for hours that Plaintiff worked over 40 in one week, and willfully denied her payment at the time of her termination of accrued and unused vacation and sick time, all in violation of the Labor Law.

### FIFTH CAUSE OF ACTION
### Assault and Battery

104.   Plaintiff realleges and incorporates by reference paragraphs 1 through 103 of the Second Amended Complaint as if fully stated herein.

105.   McNamara's conduct -- while she was acting in the scope of her employment --

including grabbing Plaintiff and pushing her into an unlit bathroom, places Plaintiff in constant fear of further imminent harm. McNamara's conduct constitutes an assault and battery in violation of New York law.

## SIXTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

106. Plaintiff realleges and incorporates by reference paragraphs 1 through 105 of the Amended Complaint as if fully stated herein.

107. Ms. McNamara's conduct -- while she was acting in the scope of her employment -- is so utterly intolerable, atrocious, extreme and outrageous as to be beyond all possible bounds of decency. This conduct was intentional and designed to, and has, inflicted severe emotional distress upon Plaintiff.

## JURY DEMAND

108. Plaintiff demands a trial by jury on all counts.

**WHEREFORE**, demand that judgment be entered in their favor as follows:

A.   With respect to the First Cause of Action, grant judgment for Plaintiff and against Defendant HVHC for compensatory and punitive damages in an amount to be shown at trial;

B.   With respect to the Second Cause of Action, grant judgment for Plaintiff and against Defendant HVHC for compensatory and liquidated damages in an amount to be shown at trial;

C.   With respect to the Third Cause of Action, grant judgment for Plaintiff and against HVHC for unpaid compensation and liquidated damages in an amount to be shown at trial;

D.   With respect to the Fourth Cause of Action, grant judgment for Plaintiff and

against HVHC for unpaid compensation and liquidated damages in an amount to be shown at trial;

E.      With respect to the Fifth Cause of Action, grant judgment for Plaintiff and against Defendants in an amount to be shown at trial;

F.      With respect to the Sixth Cause of Action, grant judgment for Plaintiff and against Defendants in an amount to be shown at trial;

G.      Grant to Plaintiff her attorneys' fees, costs, disbursements, and interest; and

H.      Grant such other relief as this Court deems just, equitable and proper.

Dated: July 17, 2006
      Yorktown Heights, New York

ANDREW S. BARON LLC

By: _____

Andrew S. Baron (AB-3316)

2074 Crompond Road
Yorktown Heights, New York 10598
(914) 261-7807

*Attorney for Plaintiff*

**EXHIBIT A**

STATE DIVISION OF HUMAN RIGHTS
STATE OF NEW YORK : EXECUTIVE DEPARTMENT

STATE DIVISION OF HUMAN RIGHTS
on the Complaint of

ALINA KOLESNIKOW

                Complainant

       v.

HUDSON VALLEY HOSPITAL CENTER

              Respondent

VERIFIED COMPLAINT
Pursuant to Executive
Law, Article 15

Case No.
10101550

Federal Charge No. 16GA410977

I, Alina Kolesnikow, residing at 27 Reynolds Lane, Apt. 72, Buchanan, NY, 10511, charge the above named respondent, whose address is 1980 Crompond Road, Cortlandt Manor, NY, 10567 with an unlawful discriminatory practice relating to employment in violation of Article 15 of the Executive Law of the State of New York (Human Rights Law) because of age, national origin.

Date most recent or continuing discrimination took place is 8/11/2004.

The particulars are:

1. I am a 55 years old and Polish. Because of this, I have been subjected to unlawful discriminatory actions.

2. I started employment with respondent on 09/09/02 as a Certified Nursing Assistant (CAN).

3. My time, attendance and performance were at least satisfactory.

4. Sometime in November, 2003 I was suspended for allegedly negligent in giving food to a patient who was scheduled to undergo operation. The truth was that the RN failed to inform me or to write a note on the patient's chart or on the board.

5. Sometime in March 2004, I was again suspended for alleged manifesting race prejudice.

6. Towards the end of July 2004, I was terminated for placing a food tray on the floor. I only did it to attend to a patient who was in need of immediate attention and assistance.

Complaint
SDHR Case No. 10101550
Alina Kolesnikow v. Hudson Valley Hospital Center

   7.   There were incidents in the past when I was told by a
nursing instructor that the hospital was looking for younger
individuals to perform my job.

   8.   I have been told that my English was not good and I could
not communicate with other staff well enough.  The fact was that
I could perform my job without any communication problem.

   9.   I believe that respondent terminated my employment
because of my age and because of my national origin.


Based on the foregoing, I charge respondent with an unlawful
discriminatory practice relating to employment because of age,
national origin, in violation of the New York State Human Rights
Law (Executive Law, Article 15), Section 296.

I also charge the above-named respondent with violating Title
VII of the Civil Rights Act of 1964, as amended (covers race,
color, creed, national origin, sex relating to employment).  I
also charge the above-named respondent with violating the Age
Discrimination in Employment Act (ADEA) as amended (covers ages
40 years of age or older in employment).  I hereby authorize
SDHR to accept this verified complaint on behalf of the U.S.
Equal Employment Opportunity Commission (EEOC) subject to the
statutory limitations contained in the aforementioned law(s).


I have not commenced any other civil action, nor do I have an
action pending before any administrative agency, under the same
or any other law based upon this same unlawful discriminatory
practice.


_Alina Kolesnikow_
Alina Kolesnikow

Page 2 of 3

Complaint
SDHR Case No. 10101550
Alina Kolesnikow v. Hudson Valley Hospital Center

STATE OF NEW YORK   )
                     )   SS:
COUNTY OF            )

Alina Kolesnikow, being duly sworn, deposes and say: that he/she
is the complainant herein; that he/she has read (or had read to
him or her) the foregoing complaint and knows the  content
thereof; that the same is true of his/her own knowledge except
as to the matters therein stated on information and belief; and
that as to those matters, he/she believes the same to be true.

_____
Alina Kolesnikow

Subscribed and sworn to
before me this 15th day
of September, 2004

_____
Signature of Notary Public

NANCY TEJADA WARD
Notary Public, State of New York
No. 01TE6095289
Qualified in Westchester County
Commission Expires July 7, 2007

Page 3 of 3

**<u>EXHIBIT B</u>**

# DISMISSAL AND NOTICE OF RIGHTS

To: Alina Kolesnikow
P.O. Box 372
Buchanan, NY 10511

From: New York District Office
33 Whitehall Street
5th Floor
New York, NY 10004

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR § 1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16G-2004-10977 | Holly M. Woodyard, Investigator | (212) 336-3643 |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

## - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed <u>WITHIN 90 DAYS</u> of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

Spencer H. Lewis, Jr.,
Director

SEP 0 2 2005
*(Date Mailed)*

Enclosure(s)

cc: HUDSON VALLEY HOSPITAL CENTER
1980 Crompond Road
Cortlandt Manor, NY 10567
Attn: Director of Human Resources

## AFFIDAVIT OF SERVICE

I, Andrew S. Baron, declare as follows:

1.      I am over 18 years of age and am not party to this action.  My Business Address is Andrew S. Baron LLC, 2074 Crompond Road, Yorktown Heights, New York 10598.

2.      On July 17, 2006, I served a copy of the enclosed Second Amended Complaint upon:

> Sean H. Close, Esq.
> Putney, Twombley, Hall & Hirson LLP
> 521 Fifth Avenue
> New York, New York 10175

> *Attorneys for Defendants Hudson Valley Hospital Center and Catherine McNamara*

by depositing a true and correct copy thereof in the United States mail with the first class postage thereon fully prepaid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 17, 2006 at New York, New York.

_____
Andrew S. Baron

Sworn to before me this
17th day of July 2006

_____
Notary Public

STEVEN I. LOCKE
NOTARY PUBLIC, STATE OF NEW YORK
NO. 02LO6032584
QUALIFIED IN KINGS COUNTY
COMMISSION EXPIRES JANUARY 27, 2010