UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALINA KOLESNIKOW,

                          Plaintiff,

    - against -

HUDSON VALLEY HOSPITAL CENTER
and CATHERINE McNAMARA,

                      Defendants.

Case No. 05-9858 (SCR) (GAY)

**DEFENDANTS'**
**RULE 56.1 STATEMENT**

Pursuant to Rule 56.1 of the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Southern District of New York and this Court's motion rules, the following is Defendants' statement of material facts about which Defendants contend there are no issues to be tried.[1]

**Plaintiff's Employment at HVHC**

       1.     Hudson Valley Hospital Center ("HVHC") is a 128-bed not-for-profit hospital located at 1980 Crompond Road, Cortlandt Manor, New York. (Complaint ¶ 5)

       2.     Plaintiff commenced employment with HVHC as a part-time Nursing Assistant on the Hospital's Brillinger Unit on September 9, 2002 (Pl. Tr. 312; Complaint ¶ 10)

       3.     Plaintiff is of Polish national origin. (Complaint ¶ 4)

       4.     Plaintiff's date of birth is December 26, 1948. (Complaint ¶ 4)

---

[1]    Each assertion will include a reference to the relevant source, when possible. The Second Amended Complaint is contained within the accompanying Appendix of Exhibits as Exhibit A. "Pl. Tr. ___" refers to pages in Plaintiff's deposition transcript, copies of which are contained within the Appendix of Exhibits as Exhibit B; "Keeler Tr.____" refers to pages in the deposition transcript of Karen Keeler, copies of which are contained in the Appendix of Exhibits as Exhibit C; "Espinoza Tr. ___" refers to pages in the deposition transcript of Ruth Espinoza, copies of which are contained in the Appendix of Exhibits as Exhibit Q; "Johnson Aff." refers to the affidavit of Ruth Johnson, Director of Human Resources for HVHC; "McNamara Aff." refers to the affidavit of Catherine McNamara, Clinical Nurse Manager for HVHC's Brillinger Unit; Exhibits referred to herein as "Ex. ___" are

5.      The Brillinger Unit is a 33-bed medical-surgical unit dedicated primarily to serving cardiac patients. (Complaint ¶ 10).

6.      As a Nursing Assistant, Plaintiff assisted the Registered Nurses ("RN") in caring for patients on the Unit; her duties included bathing, feeding and taking and recording patient vital signs. (Complaint ¶ 10; McNamara Aff. ¶ 6).

7.      Plaintiff typically worked as part of a team, with an RN as team leader and a Licensed Practical Nurse or another RN; each team was assigned approximately 10-12 patients on a shift. (McNamara Aff. ¶ 6).

8.      In connection with her application for employment at HVHC, Plaintiff submitted an employment application, dated July 26, 2002. (Pl. Tr. 263-64; Ex. R)

9.      As part of the application process, Plaintiff interviewed with Catherine McNamara ("McNamara"), the Clinical Nurse Manager for the Brillinger Unit, and a defendant in this action. (Pl. Tr. 41-43)

10.     McNamara has ultimate supervisory responsibility over all nursing staff on the Brillinger Unit, including RN's and Nursing Assistants.  (McNamara Aff ¶ 2; Pl. Tr. 313)

11.     Plaintiff also interviewed with Karen Keeler ("Keeler"), who was employed as the Administrative Director of Patient Services for HVHC. (Pl. Tr. 41-43)

12.     McNamara was Plaintiff's direct supervisor throughout Plaintiff's employment at HVHC. (Pl. Tr. 313-14)

13.     McNamara reported directly to Keeler throughout Plaintiff's employment at HVHC. (McNamara Aff. ¶ 3; Keeler Tr. 9-10)

14.     McNamara and Keeler reviewed Plaintiff's employment application in connection with their review of her qualifications for employment. (McNamara Aff. ¶ 4; Keeler

_____

contained in the accompanying Appendix of Exhibits.

Tr. 16 )

15.     Plaintiff's employment application revealed that she was educated in Poland. (Ex. R)

16.     McNamara made the decision to hire Plaintiff, and the decision was approved by Keeler. (McNamara Aff. ¶ 3; Keeler Tr. 8-10)

17.     McNamara's date of birth is July 2, 1941. (McNamara Aff. ¶ 1).

18.     Keeler's date of birth is June 19, 1951. (Keeler Tr. 5).

19.     In or around March 2003, McNamara offered Plaintiff the opportunity to work full-time. (Pl. Tr. 313)

20.     Plaintiff became a full-time Nursing Assistant on March 2, 2003; she continued working on the Brillinger Unit and reporting to McNamara. (Complaint ¶ 13; Johnson Aff. ¶ 3).

21.     Upon becoming a full-time employee, Plaintiff was regularly assigned to work three twelve-hour shifts (7am -7pm) each week. (McNamara Aff. ¶ 6; Pl. Tr. 208-09)

**Disciplinary Actions Against Plaintiff**

22.     On or about August 6, 2003, Plaintiff was reprimanded for accusing an RN of failing to give a patient a blood transfusion and improperly disposing of the blood. (Keeler Tr. 18-22; Pl. Tr. 116-19)

23.     On or about August 21, 2003, Plaintiff met with Keeler and McNamara to discuss their dissatisfaction with aspects of her performance. (Pl. Tr. 147-48; Keeler Tr. 23-25)

24.     During the August 21 meeting, Plaintiff was admonished for incidents where her supervisors felt she had acted outside the scope of her responsibilities as a Nursing Assistant. (Id.)

25.     In the meeting Keeler discussed an incident in which Plaintiff performed an accu-check (i.e. , a test to determine blood-sugar level) on a diabetic patient at 4:00 pm, when the accu-check sheet indicated that it was to be done at 6:00 pm. (Pl. Tr. 121-24, 147-48)

26.     Plaintiff concedes that she did not do the accu-check at the designated time.  (Pl. Tr. 121-27)

27.     Keeler advised Plaintiff that she was supposed to check with a nurse before changing the time of an accu-check. (Id. at 126-27)

28.     Keeler also reprimanded Plaintiff for an incident in which she argued with an RN in the presence of a patient concerning the appropriate method of toileting the patient. (Id. at 143-48)

29.     Keeler advised Plaintiff at the meeting that it was essential that she follow the direction of the nurses with whom she was working at all times. (Id. at 149)

30.     At the August 21 meeting, Keeler also discussed an incident that occurred prior to the meeting where McNamara warned Plaintiff for informing a patient of his temperature reading.  (Id. at 138-41)

31.     Keeler prepared an anecdotal record memorializing the subjects discussed at the August 21, 2003 meeting. (Keeler Tr. 71-72)

32.     Keeler attached to the anecdotal record a document prepared by McNamara memorializing some of the conduct and performance related incidents for which Plaintiff had been counseled prior to the meeting. (Keeler Tr. 71-72; McNamara Aff. ¶ 18; Ex. O).

33.     In August 2003, McNamara prepared a performance appraisal for Plaintiff covering the period September 2002 – September 2003. (Ex. P; McNamara Aff. ¶ 19; Pl. Tr. 151-53)

4

34.   McNamara met with Plaintiff to discuss the performance appraisal, including McNamara's comment that Plaintiff "sometimes oversteps her role as a [Nursing Assistant]." (McNamara Aff. ¶ 19; Ex. P; Pl. Tr. 151-53)

35.   On November 4, 2003, Plaintiff allowed a patient to eat after having been informed that the patient was scheduled for surgery and therefore not permitted to eat.  (Pl. Tr. 157-61)

36.   Plaintiff received a written warning and was suspended for two days for allowing the patient to eat.  (Ex. G; Johnson Aff. ¶ 11; Pl. Tr. 167-69)

37.   On or about May 3, 2004, Keeler learned that Plaintiff had made racially insensitive remarks to two African-American co-workers.  (Johnson Aff. ¶ 12; Exs. H & I).

38.   Bonnie St. John, a Caucasian Nursing Assistant, reported that Plaintiff questioned St. John about why she married a black man upon seeing Ms. St. John's son, who is African-American. (Keeler Tr. 26-27; Ex. H).

39.   Johanna Walker, an African-American Dietary Aide, reported that Plaintiff approached her while she was eating lunch and, in response to Walker's comment that she worked two jobs, expressed surprise and stated that she thought black people were lazy. (Keeler Tr. 30-32; Ex. H)

40.   St. John and Walker provided HVHC with statements concerning Plaintiff's comments. (Ex. H)

41.   Plaintiff admitted in her deposition that she stated to Walker that "some black people can be lazy" while discussing Walker's second job. (Pl. Tr. 69-72)

42.   Plaintiff admitted that she asked St. John whether her husband was black. (Pl. Tr. 181-83)

43.     Plaintiff met with Keeler and other officers of HVHC to discuss her comments to St. John and Walker.  (Pl. Tr. 175-86; Keeler Tr. 29-30)

44.     Plaintiff admitted that she felt it was "unusual" for a white woman to be married to a black man in Poland. (Pl. Tr. 184-85)

45.     Keeler issued Plaintiff a written warning based on the racial comments and referred Plaintiff to the HVHC employee assistance program ("EAP") for sensitivity training. (Keeler Tr. 29; Pl. Tr. 187-90; Ex. I)

46.     On August 2, 2004, Plaintiff was assigned to provide one-to-one (1:1) care for a post-surgical patient who was pulling at her intravenous tube and, thus, was in danger of injuring herself. (McNamara Aff. ¶¶ 25-26; Pl. Tr. 221-22)

47.     When providing 1:1 care for a patient, a Nursing Assistant is not permitted to leave the patient alone. (McNamara Aff. ¶¶ 25-26; Pl. Tr. 130-131, 243)

48.     Plaintiff was aware that she was not permitted to leave the patient alone. (Pl. Tr. 130-31, 225)

49.     McNamara reported that she observed Plaintiff in the hallway during the time she was supposed to be observing the 1:1 patient and questioned her about why she was not in the patient's room.  (McNamara Aff. ¶ 28)

50.     McNamara reported that she observed Plaintiff in the hallway with a cup of coffee later that same day. (McNamara Aff. ¶ 29; Pl. Tr. 239-40)

51.     McNamara reported that the 1:1 patient was unattended during the time Plaintiff went to get coffee. (McNamara Aff. ¶ 29)

52.     On August 2, 2004, HVHC was undergoing a survey by the Joint Commission on Accreditation of Health Care Organizations ("JHACO"), which oversees the quality and safety of healthcare provided at accredited organizations. (McNamara Aff. ¶ 27; Pl.

Tr. 225-26)

53.     HVHC maintains a sanitary rule prohibiting employees from placing patient food trays on the floor; Plaintiff was aware of this rule. (Pl. Tr. 231-232; McNamara Aff. ¶ 30)

54.     Plaintiff concedes that she placed a food tray on the floor near the doorway of a patient's room on August 2, and that anyone standing in the hallway outside the room could see it. (Pl. Tr. 231-232)

55.     McNamara admonished Plaintiff for leaving the tray on the floor. (McNamara Aff. ¶ 31; Pl. Tr. 234-36)

56.     Plaintiff's employment was terminated on August 12, 2004 based on the events of August 2. (Johnson Aff. ¶ 18; Pl. Tr. 243-45)

**Plaintiff's Discrimination Complaints**

57.     Plaintiff filed a complaint of national origin and age discrimination against HVHC with the New York State Commission of Human Rights on or about September 15, 2004 ("NYSDHR Complaint"). (Complaint ¶ 7; Ex. D)

58.     Plaintiff did not name McNamara as a respondent in her NYSDHR Complaint. (Ex. D)

59.     Plaintiff did not claim that McNamara touched or otherwise assaulted her in the NYSDHR Complaint. (Ex. D)

60.     Plaintiff commenced the instant action on or about November 22, 2005. (Complaint ¶ 9).

61.     Plaintiff never complained of national origin discrimination to anyone employed by the Hospital prior to filing her NYSDHR Complaint. (Johnson Aff. ¶ 19 ; Pl. Tr. 53-59)

62.    Plaintiff never complained of age discrimination to anyone employed by the Hospital prior to filing her NYSDHR Complaint. (Johnson Aff. ¶ 19; Pl. Tr. 53-59)

63.    McNamara never commented on Plaintiff's Polish national origin. (Pl. Tr. 35)

64.    Keeler never commented on Plaintiff's Polish national origin. (Pl. Tr. 35)

65.    McNamara never commented on Plaintiff's age. (Pl. Tr. 205)

66.    Keeler never commented on Plaintiff's age. (Id.)

**Plaintiff's FLSA Allegations**

67.    HVHC employees record their time worked by signing in and signing out on sign-in sheets maintained on the unit on which the employee works. (Johnson Aff. ¶ 25)

68.    Plaintiff utilized the sign-in sheets to record her time. (Pl. Tr. 360-61)

69.    Plaintiff did not keep any log or other personal record memorializing the hours she worked at HVHC. (Id. at 340-42; 353, 359, 426)

70.    During her employment, Plaintiff was paid for 171.75 hours of overtime at 1.5 times her regular rate of pay. (Johnson Aff. ¶ 27; Ex. K)

71.    Plaintiff never complained to anyone at HVHC that she was not paid time and a half for overtime she worked. (Johnson Aff. ¶ 26)

72.    Plaintiff never checked her paychecks to see if she had in fact received overtime at 1.5 times her regular wage for hours worked over 40 per week.  (Pl. Tr. 212-13)

73.    HVHC's policy is to pay overtime to CNA's at 1.5 times the normal hourly rate for any hours worked above 40 in a week. (Johnson Aff. ¶ 24)

74.    HVHC determines the hours worked by an employee based on the sign-in sheets prepared on the employee's unit. (Johnson Aff. ¶ 25)

75.     Employees are required by policy to sign-in when commencing their shift and to sign-out when their shift ends.  (Johnson Aff. ¶ 25)

76.     On the Brillinger Unit, the sign-in sheet was kept in a book at the nurse's station. (Pl. Tr.  360- 361)

77.     Plaintiff was aware of the sign-in requirement and regularly signed in and signed out according to policy. (Pl. Tr. 360-61)

78.     Employees sometimes forgot to sign-in and/or to sign-out on the sign-in sheets. (Pl. Tr. 374-75)

79.     Ms. McNamara or another supervisor would fill in the sign-in sheet on behalf of Brillinger Unit employees who forgot or otherwise failed to record their time in the sign-in book. (McNamara Aff. ¶ 8; Pl. Tr. 374-75)

80.     Pursuant to HVHC policy, employees are required to obtain permission to work overtime unless an emergency arises that prevents the employee from first obtaining permission.  (McNamara Aff. ¶ 9; Pl. Tr. 382-83)

81.     Pursuant to HVHC policy, RN's are required to report for work 15 minutes prior to the start of their designated shift to discuss the status of patients with the departing nurse, and RN's paid for this time.  (McNamara Aff. ¶ 14)

82.     CNA's are not required to report to work prior to their designated shift and are not permitted to begin work prior to their shift, unless asked to do so by a supervisor.  (Id.)

83.     Plaintiff advised Ms. McNamara when she noticed inaccuracies on her sign-in sheet.  (Pl. Tr. 342-345, 371-72, 376)

84.     Anytime Plaintiff advised Ms. McNamara of a mistake on her time sheet, it was corrected. (Id. at 342-45, 371-72, 376, 391)

85.     Plaintiff is unable to quantify the number of hours of overtime she claims

9

HVHC owes her. (Pl. Tr. 340-42)

**Plaintiff's Claims for Accrued Vacation and Sick Leave**

86.     Plaintiff received a copy of the HVHC employee handbook when she commenced employment. (Pl. Tr. 396)

87.     Plaintiff reviewed the employee handbook. (Pl. Tr. 397)

88.     The Terminal Pay provision of the employee handbook states that "a regular full-time or regular part-time employee in the Hospital may be entitled to pro-rated terminal vacation pay provided that the employee gave advanced notice of resignation equal to the annual vacation benefit . . ." (Ex. M)

89.     HVHC's internal policy governing Terminal Pay also provides that a regular full or part-time employee who resigns after six months of service and has given proper notice is entitled to her accrued unused vacation leave.  (Ex. L; Johnson Aff. ¶ 29)

90.     HVHC's internal policy governing Sick Leave provides that "[a]ccrued unused sick hours will not be paid upon termination or change of status." (Ex. N; Johnson Aff. ¶ 30)

91.     HVHC's internal policy governing Vacation Leave provides that "[e]mployees who are terminated by the Hospital for cause shall not be eligible for vacation pay." (Ex. N; Johnson Aff. ¶ 30)

92.     Plaintiff filed a complaint with the New York State Department of Labor after her termination seeking her accrued vacation and sick time.  Plaintiff did not complain of unpaid overtime to the Dept. of Labor (Pl. Tr. 400)

**Plaintiff's Allegations of Assault and Battery**

93.     Plaintiff alleges that on August 2, 2004, Ms. McNamara grabbed her arm and pushed her into a bathroom while reprimanding her for placing a food tray on the floor. (Complaint ¶ 84; Pl. Tr. 100-01)

94.     Plaintiff suffered no physical injury from Ms. McNamara's alleged action. (Id. at 113-14)

95.     Plaintiff never complained to anyone that Ms. McNamara had grabbed her. (Id. at 112-13)

96.     This action was not commenced within one year of Ms. McNamara's alleged assault on Plaintiff. (Cf. Complaint ¶ 84 with Complaint ¶ 9)

97.     Plaintiff did not include any allegations regarding the assault in her NYSDHR Complaint. (Ex. D)

Dated: New York, New York
       May 15, 2007

                          PUTNEY, TWOMBLY, HALL & HIRSON LLP
                          *Attorneys for Defendants*


                          /s/_____
                          Sean H. Close (SC 7429)
                          521 Fifth Avenue
                          New York, New York 10175
                          (212) 682-0020

## CERTIFICATE OF SERVICE

The undersigned, a member of the Bar of this Court, hereby certifies that he personally served a true and accurate copy of the foregoing NOTICE OF MOTION; AFFIDAVIT OF RUTH JOHNSON; AFFIDAVIT OF CATHERINE MCNAMARA; THE DECLARATION OF SEAN H. CLOSE; DEFENDANT'S RULE 56.1 STATEMENT; THE APPENDIX OF EXHIBITS; AND DEFENDANTS' MEMORANDUM OF LAW this 15th day of May, 2007, via Federal Express upon:

> Andrew S. Baron LLC
> 1025 Westchester Avenue, Suite 106
> White Plains, New York 10604
> (914) 261-7807

/s/_____
Sean H. Close (SC- 7429)