UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALINA KOLESNIKOW,

                            Plaintiff,                    **OPINION
                                                         AND ORDER**

            -against-

HUDSON VALLEY HOSPITAL                    05 Civ. 09858 (PGG)
CENTER and CATHERINE
MCNAMARA,

                            Defendants.


PAUL G. GARDEPHE, U.S.D.J.:

            In this action, Plaintiff Alina Kolesnikow claims that Defendant Hudson

Valley Hospital Center ("HVHC") unlawfully discriminated against her in violation of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq. ("Title VII"), and

the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"), by

terminating her employment because of her age and Polish national origin.  (Cmplt. ¶¶ 1,

96-99)[1]  Kolesnikow further claims that HVHC violated the Fair Labor Standards Act

and the New York Labor Law by failing to pay her all the overtime wages due her and by

failing to pay her for accrued, unused vacation and sick time when it terminated her

employment.  (Id. ¶¶ 1, 100-03)  Kolesnikow also asserts claims under New York law

against HVAC and Catherine McNamara, her former supervisor, for intentional infliction

of emotional distress and assault and battery.  (Id. ¶¶ 1, 104-07)

_____

[1] All cites to "Cmplt." are cites to Kolesnikow's Second Amended Complaint (Docket
No. 21).

Defendants have moved for summary judgment on all of Kolesnikow's claims.  (Docket No. 37)  For the reasons stated below, Defendants' motion is DENIED as to her New York Labor Law claim for vacation and sick pay, and is otherwise GRANTED.

## **DISCUSSION**

Summary judgment is warranted if the moving party shows that "there is no genuine issue as to any material fact" and that it "is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor," Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008), and the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment."  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).

## I.    **PLAINTIFF'S DISCRIMINATION CLAIMS**

Courts analyze Title VII and ADEA claims under a well-established burden-shifting framework, under which:

> the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  If the plaintiff does so, the burden shifts to the defendant to articulate "some legitimate, non-discriminatory reason" for its action.  If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of . . . discrimination.  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008) (citations omitted) (describing framework for deciding Title VII cases); Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000) (Title VII framework applies to ADEA claims).

"It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," and that "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001). As in any other case, "an employment discrimination plaintiff faced with a properly supported summary judgment motion must 'do more than simply show that there is some metaphysical doubt as to the material facts'. . . . She must come forth with evidence sufficient to allow a reasonable jury to find in her favor." Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

The Court is mindful that "direct evidence of . . . [discriminatory] intent will only rarely be available, . . . [so] 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" Holcomb, 521 F.3d at 137. However, the Court must also "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999). A plaintiff must offer "concrete particulars," id. at 451-52, not "[m]ere conclusory statements, conjecture or speculation," in order to defeat a properly supported motion for summary judgment, Gross v. Nat'l Broad. Co., Inc., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002). See also Holcomb, 521 F.3d at 137 ("Even in the discrimination

context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").

    **A.**    <u>**Facts**</u>

        **1.**    <u>**HVHC's Decision to Hire Plaintiff**</u>

Defendant HVHC is a 128-bed hospital in Cortlandt Manor, New York. (Def. Rule 56.1 Stat. ¶ 1)[2]  Plaintiff Kolesnikow, who is of Polish national origin, commenced employment at HVHC in September 2002, at which time she was 53 years old.  (Id. ¶¶ 2-4)  Kolesnikow worked in HVHC's Brillinger Unit as a nursing assistant. (Id. ¶ 2)

Defendant McNamara was the Clinical Nurse Manager for the Brillinger Unit and was Kolesnikow's direct supervisor.  (Id. ¶¶ 9, 12)  In order to obtain her position, Kolesnikow interviewed with McNamara, who is seven years older than her, and McNamara's supervisor, Karen Keeler, the Administrative Director of Patient Services, who is three years younger than Kolesnikow.  (Id. ¶¶ 4, 9, 11, 13, 17-18) McNamara had ultimate supervisory authority over nursing staff in the Brillinger Unit and made the decision to hire Kolesnikow.  (Id. ¶¶ 10, 16)

_____

[2]  This Court relies on facts drawn from Defendants' Rule 56.1 Statement where Plaintiff has admitted those facts or has not controverted them with citations to admissible evidence.  Where Plaintiff disagrees with Defendants' characterization of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence.  See Cifra, 252 F.3d at 216 (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

Kolesnikow was initially hired to work part-time.  (Id. ¶ 2)  In March

2003, McNamara offered Kolesnikow the opportunity to work full-time, which she

accepted.  (Id. ¶¶ 19-20)

### 2.    Disciplinary Actions Against Plaintiff

McNamara gave Kolesnikow a favorable performance review for the

period from September 2002 through September 2003, but commented that Kolesnikow

"sometimes oversteps her role as a [nursing assistant]."  (Def. Rule 56.1 Stat. ¶¶ 33-34)

Keeler had met with Kolesnikow to counsel her concerning this issue on August 21,

2003.  (Id. ¶¶ 23-24)  At that meeting, Keeler discussed an incident in which Kolesnikow

had checked a patient's blood sugar level at the wrong time, and also reprimanded

Kolesnikow for arguing with a registered nurse – in the presence of a patient – about the

appropriate method of toileting the patient.  (Id. ¶¶ 25-29)

Kolesnikow was next counseled on November 4, 2003, after allowing a

patient to eat despite having been informed that the patient was scheduled for surgery and

therefore was not allowed to eat.  (Id. ¶¶ 35-36)  She was given a warning for this

incident and was suspended for two days.[3]  (Id. ¶ 36)

Kolesnikow was given another warning in May 2004 based on allegations

by two co-workers that she had made racially insensitive comments.  (Id. ¶¶ 37, 45)  One

co-worker, who is Caucasian, reported that Kolesnikow questioned her "about why she

married a black man" after seeing the co-worker's son.  (Id. ¶ 38)  Another co-worker,

---

[3] Kolesnikow denies that she received a copy of the written warning.  (Pltf. Rule 56.1
Response ¶ 36)  She admits, however, that she saw a copy of the written warning, albeit
one that did not include the statement that she would be suspended for two days and that
"[a]ny further behavior of this type will result in immediate termination."  (Pltf. Ex. 12;
Pltf. Dep. 167:19-169:14)

who is African-American, reported that after she told Kolesnikow that she worked two

jobs, Kolesnikow "expressed surprise and stated that she thought black people were

lazy."  (Id. ¶ 39)  These alleged comments were reported to Keeler, who met with

Kolesnikow to discuss the first comment,[4] and also consulted with HVHC's human

resources director, before making a decision to discipline Kolesnikow.  (Id. ¶¶ 37, 43;

Def. Ex. I)  Kolesnikow was given a warning and was instructed to contact HVHC's

employee assistance program for sensitivity training.[5]  (Def. Rule 56.1 Stat. ¶ 45)

### 3.    The Termination of Plaintiff's Employment

The next incident for which Kolesnikow was counseled, and which led to

the termination of her employment, occurred on August 2, 2004.  On that day, HVHC

was undergoing a survey by the Joint Commission on Accreditation of Health Care

Organizations, which oversees the quality and safety of healthcare provided at accredited

organizations.  (Def. Rule 56.1 Stat. ¶ 52)  One of HVHC's sanitary rules prohibits

employees from placing patient food trays on the floor, and Kolesnikow was aware of the

rule.  (Id. ¶ 53)  However, on the day of the survey, Kolesnikow placed a patient's food

tray on the floor near the doorway of a patient's room, where it could be seen from the

hallway.  (Id. ¶ 54)

That same day, Kolesnikow was assigned to provide one-to-one care for a

post-surgical patient.  (Id. ¶ 46)  When providing one-to-one care, a nursing assistant is

---

[4] Kolesnikow denies making the precise comments attributed to her, but admitted at her deposition that she asked the first co-worker whether her husband was black and that she said to the second co-worker, "I heard that some black people can be lazy."  (Def. Rule 56.1 Stat. ¶ 42; Pltf. Dep. 72:9-14)  Kolesnikow also denies that Keeler discussed the second comment with her.  (Pltf. Rule 56.1 Response ¶ 43; Pltf. Dep. 181:7-12)

[5] Kolesnikow denies that she was given a copy of a written warning.  (Pltf. Rule 56.1 Response ¶ 45)

not permitted to leave the patient alone.  (Id. ¶ 47)  McNamara saw Kolesnikow in the

hallway twice that day, while Kolesnikow was supposed to be providing one-to-one care.

(Id. ¶¶ 49-50; McNamara Aff. ¶¶ 28-29)  McNamara was "under the impression" that the

patient was suicidal, because that was a frequent reason for providing one-to-one care,

but this patient was not in fact suicidal.  (McNamara Aff. ¶ 26)  After the second

occasion that McNamara saw Kolesnikow in the hallway – this time with a cup of coffee

– she reported to Human Resources that Kolesnikow had left the patient unattended.

(Def. Rule 56.1 Stat. ¶¶ 49-51; see also Johnson Aff. ¶ 16 (testimony of Director of

Human Resources stating that Keeler and McNamara told her that Kolesnikow had left a

patient unattended while she was performing a one-to-one watch))

On August 12, 2004, McNamara instructed Kolesnikow to meet with

Keeler.  (Pltf. Dep. 243:13-23)  Keeler asked Kolesnikow whether she had placed the

food tray on the floor on August 2.  (Id. 244:19-21)  Kolesnikow admitted that she had.

(Id. 244:22)  Referring to the prior disciplinary incidents, Keeler told her that "this is the

third time," and that her employment was terminated.  (Id. 244:20-245:9)  Kolesnikow

subsequently told Ruth Johnson, HVHC's director of human resources, that she had put

the tray on the floor because her co-workers would not help her.  (Id. 48:21-49:24)

Keeler and McNamara recommended terminating Kolesnikow's

employment, and their determination was approved by Johnson and other HVHC

officers.  (Johnson Aff. ¶ 18)

### B.   **Plaintiff's Prima Facie Case of Discrimination**

To establish a prima facie case of national origin or age discrimination, a

plaintiff must offer evidence showing, inter alia, that her termination from employment

occurred "under circumstances giving rise to an inference of discrimination."  Terry v.

<u>Ashcroft</u>, 336 F.3d 128, 137-38 (2d Cir. 2003) (internal quotation omitted).  Her burden

in doing so "'is not onerous'" – indeed, it is "<u>de</u> <u>minimis</u>," <u>Beyer</u>, 524 F.3d at 163 – and

is satisfied by "evidence that raises a reasonable inference that the action taken by an

employer was based on an impermissible factor."  <u>Holcomb</u>, 521 F.3d at 138 (quoting

<u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981)).  While a low

standard applies to the prima facie case determination, "a plaintiff's case must fail if she

cannot carry this preliminary burden."  <u>Beyer</u>, 524 F.3d at 163.

        HVHC argues that it is entitled to summary judgment because Kolesnikow

has not offered evidence that raises a reasonable inference that her employment was

terminated due to her national origin or age.  (Def. Br. at 9-13)  Kolesnikow argues that

an inference of discrimination is warranted here based on (1) certain comments that were

made to her; (2) the average age of nurses in the units in which she worked; and (3)

evidence that HVHC "unfairly" disciplined her during the course of her employment.

(Pltf. Br. at 4-5)  As explained below, Kolesnikow's evidence on these issues is

insufficient to give rise to an inference of national origin or age discrimination.  (<u>See</u>

<u>infra</u> pp. 11-28)

        A plaintiff may, however, establish that her termination occurred in

circumstances giving rise to an inference of discrimination by showing that her position

remained open or that she was replaced by someone outside her protected class.  <u>Graves</u>

<u>v. Finch Pruyn & Co., Inc.</u>, 457 F.3d 181, 187 (2d Cir. 2006) (plaintiff may establish

inference of age discrimination at prima facie stage by showing that she "was replaced by

someone substantially younger" (internal quotation omitted)); <u>Zimmerman v. Assoc. First</u>

<u>Capital Corp.</u>, 251 F.3d 376, 381 (2d Cir. 2001) ("[T]he mere fact that a plaintiff was

replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of the Title VII analysis.").

Kolesnikow has offered evidence that during the two months after her termination only one nursing assistant was hired for her former unit. (Pltf. Ex. 3) That nursing assistant, Hermelinda Arce, was 36 at the time – nearly 20 years younger than Kolesnikow – and is Hispanic. (Id.) Therefore, for purposes of deciding Defendants' motion, the Court will assume that Kolesnikow was replaced by Arce, who was substantially younger and of a different national origin, and that this fact establishes Kolesnikow's prima facie case with respect to both of her discrimination claims.[6]

### C.   Plaintiff Has Not Offered Sufficient Evidence for a Jury To Find In Her Favor

HVHC has offered a legitimate, non-discriminatory reason for its decision to terminate Kolesnikow's employment: it believed that she had engaged in "misconduct" on August 2, 2004 by leaving a post-surgical patient unattended during a one-to-one care assignment and by placing a patient's food tray on the floor, and decided that this misconduct warranted termination in light of earlier disciplinary incidents and warnings. (Def. Br. at 13)

_____

[6] Neither party addressed this issue or the identity of Kolesnikow's replacement in their memoranda of law. Moreover, there is no evidence in the record that Defendants had the requisite knowledge that Kolesnikow was substantially older than Arce and was of a different national origin. See Woodman v. WWOR-TV, Inc., 411 F.3d 69, 78 (2d Cir. 2005) (an "employer must have some knowledge" of the "age discrepancy between the discharged employee and her replacement" in order for the discrepancy "to support an inference of discriminatory intent"). Nonetheless, for purposes of deciding this motion, this Court will assume that Plaintiff has made out a prima facie case of national origin and age discrimination.

Therefore, to defeat summary judgment, Kolesnikow must "raise[] sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision to fire h[er] was based, at least in part," on her age and national origin.  Holcomb, 521 F.3d at 141.  Like most plaintiffs, Kolesnikow attempts to meet her burden by showing that "the employer's stated reason for the adverse employment action is entirely pretextual."  Id. (explaining that "in many cases, a showing of pretext, when combined with a prima facie case of discrimination, will be enough to permit a rational finder of fact to decide that the decision was motivated by an improper motive").  Kolesnikow also argues that certain comments made by HVHC employees, and the average age of nursing assistants in her unit, support a finding of discriminatory intent.  However, Kolesnikow has not offered sufficient evidence for a jury to find that HVHC's stated reason for terminating her employment was pretextual or that the decision to terminate her employment was motivated by discriminatory animus.

### 1.    Plaintiff Has Not Offered Evidence Showing Pretext

Kolesnikow argues that a jury could find that HVHC has offered "inconsistent reasons" for terminating her employment, and could therefore conclude that its stated reasons are a pretext for discrimination.  (Pltf. Br. at 17-18)  She also argues that a jury could find pretext because it could conclude that HVHC and McNamara "falsely accused" her of various misconduct, including, most significantly, leaving a suicidal patient unattended on August 2.  (Id. at 4-13, 16, 18)  The evidence, however, does not permit a finding of pretext.

### a.   HVHC Has Not Offered Inconsistent Reasons For Why It Terminated Plaintiff's Employment

Kolesnikow argues that HVHC has asserted "inconsistent reasons" for terminating her employment in that it has, at various times, asserted that she was terminated because she left a food tray on the floor on August 2, because she left a patient unattended on August 2, or because of both acts.  (Pltf. Br. at 18)  However, she cites no evidence in support of this argument.  (See id.)  Moreover, McNamara's and Keeler's deposition testimony and HVHC's statement to the New York State Department of Human Rights ("NYSDHR") appear to be consistent with HVHC's position that it terminated her on the basis of both August 2 incidents.  (McNamara Dep. 40-41, 59-62; Keeler Dep. 55:11-56:4; Pltf. Ex. 11 at 4, 6)[7]

While Kolesnikow's deposition testimony suggests that Keeler only discussed the food tray incident with her before terminating her employment (see supra p. 7), an employer's stated reasons are not necessarily inconsistent simply because the employer did not discuss all of the reasons with the employee or because it formally relied on only one of the reasons.  Cf. Roge v. NYP Holdings, Inc., 257 F.3d 164, 170 (2d Cir. 2001) (employer "was not inconsistent in stating that the [employee's] suspected fraud provided a legitimate basis for its decision to terminate" him, although it "formally based the decision on job elimination," where the employer undisputedly had reason to believe that the employee had engaged in fraud).

---

[7]  Kolesnikow has provided excerpts from the transcript of her unemployment insurance hearing suggesting that HVHC focused solely on her leaving the patient unattended in explaining why her employment had been terminated.  (Pltf. Ex. 15, 16)  However, because the entire transcript has not been provided, the Court cannot determine whether HVHC failed to raise the food tray incident at that hearing.

As discussed below, Kolesnikow has not offered any reason to find that McNamara and HVHC did not believe that she had twice violated HVHC's procedures on August 2.  Moreover, McNamara's testimony, which Kolesnikow has not put into dispute, is that she brought both errors to the attention of Human Resources before the decision to terminate Kolesnikow's employment was made.  (McNamara Dep. 59-62; Pltf. Ex. 18)  Accordingly, whether or not both acts of misconduct were discussed with Kolesnikow or raised at the unemployment insurance hearing, the evidence does not support a finding that HVHC has offered inconsistent reasons for Kolesnikow's termination.[8]

### b. Plaintiff's Evidence Concerning HVHC's and McNamara's Handling of the One-to-One Patient Care Incident Does Not Show Pretext

Kolesnikow's second argument concerning pretext is that a jury could find that McNamara and HVHC made false allegations against her concerning the patient who required one-to-one care.  (Pltf. Br. at 11-13)  Under certain circumstances, a plaintiff

---

[8]  The cases cited by Kolesnikow on this point (Pltf. Br. at 18) are distinguishable.  In E.E.O.C. v. Ethan Allen, Inc., 44 F.3d 116 (2d Cir.), for example, the employer asserted three very different reasons for the plaintiff's termination:  (1) that it lacked sufficient work for plaintiff; (2) that plaintiff had performance issues; and (3) that it had compared plaintiff to another employee under certain criteria for layoffs and concluded that plaintiff should not be retained.  Each of these alleged reasons was not only inconsistent with the others but was also shown to be false.  Id. at 120.  There is no such proof here.  Similarly, in Ramos v. Marriott Int'l, Inc., 134 F. Supp. 2d 328 (S.D.N.Y. 2001), the court found that the defendant's account lacked credibility because it had flatly stated early in the litigation that the plaintiff had never complained of discrimination but later was forced to admit that the plaintiff had in fact complained about discrimination.  Id. at 344.  Here, in contrast, HVHC has always stated that Kolesnikow's misconduct on August 2 was the reason for her termination, and has offered undisputed evidence that both types of misconduct were considered in deciding to terminate her employment, although HVHC may not have discussed both acts of misconduct with Kolesnikow or presented both at the unemployment insurance hearing.

may defeat a summary judgment motion by offering evidence from which a jury could

find that the employer "trumped up false charges as a pretext for firing her." Henry v.

Daytop Village, Inc., 42 F.3d 89, 96 (2d Cir. 1994).  Moreover, "[p]roof that the

defendant's explanation is unworthy of credence is . . . one form of circumstantial

evidence that is probative of intentional discrimination, and it may be quite persuasive."

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147, 120 S.Ct. 2097, 2108

(2000) (explaining that "[i]n appropriate circumstances, the trier of fact can reasonably

infer from the falsity of the explanation that the employer is dissembling to cover up a

discriminatory purpose").  Here, Kolesnikow argues that Defendants falsely claimed that

the one-to-one patient was suicidal and claims that McNamara has given inconsistent

testimony concerning this incident.  She further contends that she never left the patient

unattended.  (Pltf. Br. at 11-13)  The evidence cited by Plaintiff does not support a

finding of pretext, however.

       With respect to the allegation that McNamara exaggerated Kolesnikow's

misconduct by falsely claiming that the patient was suicidal, it is undisputed that HVHC

and McNamara described the patient as suicidal on at least three different occasions:  (1)

when Kolesnikow was terminated; (2) in their statement to the NYSDHR; and (3) at the

unemployment insurance hearing.  The Defendants now concede that the patient was not

suicidal.  Instead, this post-surgical patient required one-to-one care because she "was in

an agitated and demented state and was pulling at her intravenous tubes."  (McNamara

Aff. ¶ 26)

       There is no evidence, however, that Defendants' earlier

mischaracterization of the reason the patient required one-to-one care was anything other

than a mistake.  McNamara has offered affidavit testimony, which Kolesnikow has not

put into dispute, that she believed on August 2 that Kolesnikow had been assigned to

watch a suicidal patient, and that she did not learn otherwise until after this lawsuit was

filed.  (McNamara Aff. ¶¶ 25-26)  It is also undisputed that one-to-one care is generally

required when a patient is a danger to him or herself, and that "frequently the reason for

[one-to-one care] is a patient's suicidal tendencies."  (Id. ¶ 26)  It is likewise undisputed

that Kolesnikow was in fact assigned to perform one-to-one care on August 2, and that

regardless of the risk factors, she was required "to be present [with the patient] at all

times to prevent the patient from injuring herself."  (Id.)  Kolesinikow concedes that the

"the rules are the same" for every one-to-one patient, whether suicidal or non-suicidal:

"you can't leave the room."  (Pltf. Dep. 242:19-243:6)  Finally, there is no evidence that

the assertion that the patient was suicidal – as opposed to merely someone who was likely

to harm herself if left unattended – was material to Defendants' decision to terminate

Kolesnikow's employment, particularly in light of her extensive disciplinary record.[9]

       Based on the undisputed evidence, HVHC's and McNamara's earlier

mischaracterizations of the patient as suicidal – rather than simply a patient who might do

harm to herself – do not provide a rational basis to conclude that McNamara or HVHC

"trumped up false charges," Henry, 42 F.3d at 96, against Kolesnikow.  See also

---

[9]  Kolesnikow asserts that leaving a suicidal patient unattended is "far more serious than"
leaving unattended a non-suicidal patient who requires one-to-one care.  (Pltf. Br. at 13)
While Keeler testified that she would consider the first situation "more serious" (Keeler
Dep. 65:20-22), Kolesnikow has offered no evidence that the allegation that the patient
was suicidal was material to the decision to terminate her.  Indeed, as noted above, she
testified that "the rules are the same" for suicidal and non-suicidal one-to-one patients.
Moreover, Kolesnikow has not offered any evidence that HVHC did not normally
terminate an employee – with a disciplinary record similar to her own – where the
employee had left unattended a non-suicidal one-to-one patient at risk of harming herself.

McDowell v. T-Mobile USA, Inc., No. 04-Civ.-2909(DGT), 2007 WL 2816194,

at **15-16 (E.D.N.Y. Sept. 26, 2007) (observing that courts take a "case-by-case

approach" in determining whether factual mistakes in a defendant's explanation of its

reasons for the adverse employment action support finding pretext, and concluding that

plaintiff had not shown a basis for pretext where the defendant "did not completely

backtrack" from its earlier statement).  While McNamara inaccurately described the

precise nature of the patient's condition, the essence of that aspect of the misconduct

allegation – that Plaintiff had been assigned to provide one-to-one care to a patient who

was at risk of harming herself – is not disputed.

Kolesnikow also asserts that McNamara has given inconsistent testimony

concerning this incident, and that accordingly a jury could find that she "is dissembling to

cover up a discriminatory purpose."  Reeves, 530 U.S. at 147.  The record does not reveal

any true inconsistency in McNamara's account.

Kolesnikow asserts, for example, that McNamara's testimony at the

unemployment hearing and during her deposition is inconsistent as to whether she

checked to see if the patient was unattended before or after seeing Kolesnikow in the

hallway.  (Pltf. Br. at 12)  However, the cited testimony is not inconsistent.  At her

deposition, McNamara testified that she saw Plaintiff "coming down the hallway with a

cup of coffee" – 75 to 100 feet away from the room; that she went into the room before

Kolesinikow; and that she found the patient alone in the room.  (McNamara Dep. 57:10-

58:5)  At the unemployment insurance hearing, McNamara testified that she encountered

Kolesinkow with a cup of coffee outside the patient's room; entered the room before

Kolesnikow; and found the patient alone.  (Pltf. Ex. 16 at P-0265:21-P-0267:3)  There is no inconsistency.

Finally, this Court must consider whether Plaintiff's evidence about this incident creates a material issue of fact as to whether she left the patient unattended. Plaintiff testified that she left the patient's room only after asking another nursing assistant, Ruth Espinoza, to stay in the room so that Plaintiff could go to the bathroom and get a cup of coffee.  (Pltf. Br. at 11; Pltf. Dep. 239)  As noted above, McNamara testified that she saw Plaintiff "coming down the hallway with a cup of coffee" – 75 to a 100 feet away from the room.  (McNamara Dep. 57:10-58:5)  Both Plaintiff and McNamara testified that McNamara then questioned Kolesnikow about why she had left the room.  (McNamara Dep. 57:10-14; Pltf. Dep. 239:24-25)  McNamara testified that she got no response from Kolesnikow, went to the room before Kolesnikow got there; and found the patient alone in the room.  (McNamara Dep. 57:10-58:5; Pltf. Ex. 16 at P-0265:21-P-0267:11)  Kolesnikow's account of her encounter with McNamara was as follows:

> [S]he said what are you doing here?  Why are you here?  Something.  And I know why she asked me like this.  And I pointed to the room and I said somebody's there or Ruth is there, I don't remember, but I think I said somebody is there.  (Pltf. Dep. 239:24-240:5)

Kolesnikow did not address whether McNamara went to the room at this point, instead simply testifying that "she didn't follow me."  (Id. at 240:5-6)  Kolesnikow went on to testify that when she reentered the room, Espinoza was there.  (Pltf. Dep. 240:20-22)

Espinoza's testimony is that she was in and out of the room during the day caring for another patient in that room, but that Kolesnikow never asked her for any assistance.  (Espinoza Dep. 37:14-39:14)

16

As is evident from this factual recitation, Kolesnikow has not created and cannot create an issue of fact as to whether McNamara found the patient alone in her room.  It is undisputed that Kolesnikow left the room to go to the bathroom and get a cup of coffee.  It is further undisputed that McNamara observed Kolesnikow outside the room and as much as one hundred feet away.  McNamara testified that she then went to check to determine whether the patient was unattended and found the patient alone. Kolesnikow is not competent to dispute this testimony, because she concededly was not there.  Moreover, the third witness – Espinoza – does not support Kolesnikow's position, having testified that Kolesnikow never asked her for any assistance that day.

Even if a jury could reasonably conclude that McNamara never checked the room but simply assumed that Kolesnikow had left the patient unattended and then reported this assumption to Human Resources and her superiors, and could further conclude that Espinoza – contrary to Espinoza's testimony – was asked to and did watch the patient while Kolesnikow went to the bathroom and got a cup of coffee, such a factual record would not – under the circumstances of this case – give rise to an inference of discriminatory animus.  (See infra pp. 20-24)

### c.    Plaintiff's Other Evidence that She Was Subjected to "Unfair" Discipline Does Not Show Pretext

Kolesnikow argues that there were other instances in which the Defendants falsely accused her of misconduct or exaggerated her misconduct, and that a jury could find pretext on this basis.

Where a plaintiff has been terminated for misconduct, the question is not "whether the employer reached a correct conclusion in attributing fault [to the plaintiff] . . . , but whether the employer made a good-faith business determination."

17

Baur v. Rosenberg, Minc, Falkoff & Wolff, No. 07-Civ.-8835(GEL), 2008 WL 5110976, at *5 (S.D.N.Y. Dec. 2, 2008); see also McPherson v. New York City Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff.  We are interested in what motivated the employer. . . ." (emphasis in original) (internal quotation omitted)); Agugliaro v. Brooks Bros., Inc., 927 F. Supp. 741, 747 (S.D.N.Y. 1996) ("Even assuming defendants were wrong in their belief that plaintiff had engaged in sexual misconduct, what is significant is that they based their decision to dismiss plaintiff on that belief, and not on his age, gender, or pension status.").

Therefore, in the absence of evidence undermining HVHC's assertion that it believed in good faith that Kolesnikow's conduct merited discipline and termination, or of any other evidence of pretext or discriminatory intent, HVHC is entitled to summary judgment.  Ascione v. Pfizer, Inc., 312 F. Supp. 2d 572, 578-79 (S.D.N.Y. 2004); see also Maturine v. Am. Int'l Group, Inc., No. 04-Civ.-9064(GBD), 2006 WL 2347806, at *4 (S.D.N.Y. Aug. 14, 2006) (in a case where the employer claims that the plaintiff was fired for misconduct, "[t]he appropriate inquiry is whether [the employer] . . . had a good faith reason to believe plaintiff had engaged in misconduct, [and] that such misconduct was in fact the reason for his firing").

Kolesnikow has offered no such evidence.  While she offers excuses for placing the patient's food tray on the floor on August 2, she does not offer any evidence that Defendants acted in bad faith in disciplining her for that conduct, or that Defendants treated employees who engaged in similar misconduct under similar circumstances more leniently.  (Pltf. Br. at 9-10)  Moreover, while Kolesnikow argues that she did not engage

18

in the earlier misconduct for which she was disciplined – or that if she did engage in the alleged conduct, she had a good reason for doing so – she offers no evidence that Defendants did not believe that she had engaged in conduct warranting discipline; that anyone who reported the events for which she was disciplined did so in bad faith or was motivated by discriminatory intent; or that Defendants treated employees who were accused of similar misconduct more leniently.[10]  (Pltf. Br. at 4-9)  Because the issue is not whether Defendants "reached a correct conclusion in attributing fault" to Kolesnikow, Baur, 2008 WL 5110976, at *5, her assertions that she did not engage in or was justified in engaging in the conduct at issue, even if true, cannot defeat Defendants' summary judgment motion.

Kolesnikow also asserts that Defendants' investigation into her alleged misconduct was inadequate, and that Defendants disciplined her based on "hastily formed conclusions."  (Pltf. Br. at 4)  However, in the absence of evidence that Defendants acted in bad faith, failed to follow their ordinary disciplinary procedures or treated other employees differently – proof that is completely lacking here – complaints about the adequacy of HVHC's investigation, even if accepted as true, cannot show pretext or defeat a summary judgment motion.  See Rodriguez v. City of New York, No. 05-Civ.-5117, 2008 WL 420015, at *13 (E.D.N.Y. Feb. 11, 2008) ("The fact that an employee

_____

[10]  Kolesnikow also makes claims that are not supported by the evidence.  For example, she argues that she never made a "racial slur[] about 'blacks being lazy.'"  (Pltf. Br. at 8)  However, Kolesnikow conceded at her deposition that she remarked to a co-worker that "sometimes, black people can be lazy." (Pltf. Dep. 69:4-19)  Although Kolesnikow contends that she was referring to one co-worker in particular, she conceded at her deposition that she remarked to a co-worker, "I heard that some black people can be lazy."  The co-worker, who was African-American, responded that she worked two jobs. (Id. 72:8-21)  Kolesnikow replied, "but how about Valeshia," an African-American employee whom Kolesnikow believed was lazy.  (Id.)

disagrees with the results of an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was based on a faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext . . . ."); Jordan v. Olsten Corp., 111 F. Supp. 2d 227, 236 (W.D.N.Y. 2000) (employer entitled to summary judgment even if it "conducted a shoddy investigation" and "subsequently made a poorly informed decision to fire" the plaintiff, so long as there was no evidence that "it was . . . discriminatory animus that motivated" it to investigate plaintiff and terminate her employment).

**2.    Plaintiff Has Not Offered Any Other Evidence Showing Discriminatory Intent**

Even if a jury could find that McNamara assumed, but did not verify, that Kolesnikow left the patient unattended on August 2, and could infer pretext or bad faith from that fact, HVHC would still be entitled to summary judgment.  Although there may be circumstances where a showing of pretext would be sufficient to defeat summary judgment because a jury could "reasonably infer . . .  that the employer is dissembling to cover up a discriminatory purpose," the Supreme Court has recognized that there will "[c]ertainly . . . be instances where," despite a showing of pretext, "no rational factfinder could conclude that the action was discriminatory."  Reeves, 530 U.S. at 147-48.  Thus, "[w]hether judgment as a matter of law is appropriate in any particular case will depend on a number of factors," including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case. . . ."  Id. at 148-49.  Here, because Kolesnikow has "produced no evidence that . . . [HVHC's] reasons, even if pretextual, served as pretext for age [or national origin] discrimination," HVHC is entitled to

20

summary judgment.  Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 98 (2d Cir.

1999); see also Fisher v. Vassar Coll., 114 F.3d 1332, 1339 (2d Cir. 1997) (en banc)

("[An employment discrimination] plaintiff may prevail only if an employer's proffered

reasons are shown to be a pretext for discrimination, either because the pretext finding

itself points to discrimination or because other evidence in the record points in that

direction – or both." (emphasis in original))[11].

### a.      There Is No Evidence that McNamara Had Discriminatory Intent

As discussed above, except for Kolesnikow's evidence concerning certain

alleged comments and the age of HVHC's nursing assistants (see infra pp. 24-28),

Kolesnikow's discrimination claim here is based on the assertion that McNamara

mischaracterized her conduct or otherwise treated her unfairly.  (See supra pp. 12-17)

However, the only remaining factual basis Kolesnikow has offered for finding that

McNamara was motivated by discriminatory bias is the evidence that McNamara may

have acted on an unverified assumption in stating that Kolesnikow left the patient

unattended on August 2.  No jury could rationally infer from this evidence, when

considered in light of the record as a whole, that McNamara was motivated by

discriminatory intent.

_____

[11] Although courts in this district have characterized Fisher as having been abrogated by Reeves, the Second Circuit has explained that the two decisions are "wholly compatible and harmonious."  James v. New York Racing Ass'n, 233 F.3d 149, 155 (2000); see also Schnabel, 232 F.3d at 89 n.5 (stating that the two decisions are "consonant").  In any case, it is well-established that for an employment discrimination plaintiff to prevail, "[i]t is not enough [for the jury] to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."  Reeves, 530 U.S. at 147 (internal quotation omitted).

All of the other evidence in the record weighs heavily against drawing any such inference:  McNamara was substantially older than Kolesnikow; had made the decision to hire Kolesnikow for a part-time job approximately two years earlier, at a time when Kolesnikow was well over 40 years old; and had offered Kolesnikow a full-time position approximately one and a half years earlier.  "When the same actor hires a person already within the protected class, and then later fires that same person [within "a relatively short time," i.e., less than two years,] it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137-38 (2d Cir. 2000) (internal quotation omitted).  Thus, the fact that McNamara hired Kolesnikow a relatively short time before firing her is "highly relevant" and weighs strongly in HVHC's favor.  Schnabel, 232 F.3d at 91 (affirming summary judgment for employer, even though employer's stated reason for firing plaintiff was arguably pretextual, where same individual had hired plaintiff at age 60 and fired him three years later); see also Mathews v. Huntington, 499 F. Supp. 2d 258, 267 (E.D.N.Y. 2007) (finding that any inference of age discrimination was weakened by the fact that plaintiff was hired when he was "well within the protected class" and the decisionmakers were also older than 40).

Kolesnikow argues that the "same actor inference" cannot be drawn here, because there is no evidence that McNamara knew her age and national origin when she hired Kolesnikow.  (Pltf. Br. at 18)  By the same token, however, Kolesnikow has not proffered evidence that McNamara ever learned Kolesnikow's precise age and national origin.  (See McNamara Aff. ¶ 5 (stating that she did not learn Kolesnikow's date of birth during Kolesnikow's employment))  What the evidence does show is that the same

information about Kolesnikow's age and national origin was available to McNamara –
e.g., Kolesnikow's appearance, her name, her accent, and the fact that she was educated
in Poland (McNamara Aff. ¶¶ 4-5) – throughout Plaintiff's time at HVHC, from hiring
through termination.  There is thus no basis to find a change in circumstances that would
defeat the inference that McNamara – who hired Kolesnikow and later offered her a full-
time position – would not have fired her less than two years later based on discriminatory
animus.  Cf. Goldschmidt v. New York State Affordable Hous. Corp., 380 F. Supp. 2d
303, 317 (S.D.N.Y. 2005) (court could not infer that the individual who hired plaintiff did
not have discriminatory animus when the individual learned that plaintiff required an
accommodation for a disability only after offering plaintiff a position).

       In light of all of the evidence concerning McNamara, a jury could not
rationally infer – as opposed to speculate – that McNamara was "dissembling to cover up
a discriminatory purpose," Reeves, 530 U.S. at 147, even if the jury could find that
McNamara did not verify that Kolesnikow left the patient unattended on August 2.
Further, it is undisputed that HVHC terminated Kolesnikow's employment not just
because of the unattended patient incident, but because Kolesnikow also violated a
sanitary rule on the day of an accreditation survey and had two prior warnings.  Where an
employee's prima facie case and showing of pretext are as weak as they are here, and
where, as here, there is strong evidence weighing against an inference of discriminatory
intent, summary judgment for the employer is appropriate.  See, e.g., Norville, 196 F.3d
at 98 (affirming summary judgment for employer where plaintiff offered "barely" enough
evidence to show pretext); Schnabel, 232 F.3d at 91 (affirming summary judgment for
employer where plaintiff offered evidence showing pretext, but same-actor inference and

evidence of legitimate motives defeated any inference of unlawful discrimination);

Norton v. Sam's Club, 145 F.3d 114, 119-20 (2d Cir. 1998) (employer was entitled to

judgment as a matter of law where employee made out an "extremely weak" prima facie

case and jury could find that employer offered "absurd" reason for firing plaintiff, but

record was "devoid of evidence, direct or circumstantial, to support a finding that"

employer fired plaintiff "because of his age").

> **b.    The Alleged Comments Do Not Give
> Rise to an Inference of Discrimination**

        Kolesnikow also argues that the following remarks and questions by

HVHC employees give rise to an inference of discrimination:  (1) a comment by a nurse,

Chris Malmgreen, at a training session at the beginning of Kolesnikow's employment,

that if the participants knew any "young girls" who wanted to work as nursing assistants,

HVHC would be interested in training and employing them (Pltf. Br. at 4 (citing Pltf.

Dep. 191-96)); (2) a question by an HVHC employee to Kolesnikow "in a joking manner

how to say 'pee' in Polish" (id. (citing Pltf. Dep. 28-34)); and (3) unspecified comments

by "Hospital employees . . . on [Kolesnikow's] accent, state[ments] that she could not

speak English, and . . . [questions about] what country she was from" (id. (citing Pltf.

Dep. 29-31, 65, 79-81, 94-95)). [12]  (See also Pltf. Br. at 17)

        These remarks are not probative of discriminatory intent.  The Second

Circuit has recognized that "all comments pertaining to a protected class are not equally

---

[12]  Plaintiff's testimony that another nurse, Linda Crawford, told her that HVHC "did not like older nurses" (Pltf. Dep. 55) is inadmissible hearsay and cannot be considered by this Court in deciding Defendants' summary judgment motion.  Plaintiff has not offered evidence from which the Court could find that the alleged comment by Crawford should be considered an admission by a party-opponent.  See Fed. R. Evid. 801(d)(2).

probative of discrimination."  Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111,

115 (2d Cir. 2007).  "The relevance of discrimination-related remarks . . . depend[s] . . .

on their tendency to show that the decision-maker was motivated by assumptions or

attitudes relating to the protected class."  Id. at 116.  "The more a remark evinces a

discriminatory state of mind, and the closer the remark's relation to the allegedly

discriminatory behavior, the more probative that remark will be."  Id. at 115.

   Here, the remarks cited by Plaintiff have no relationship to the allegedly

discriminatory behavior, because there is no evidence that they were made close in time

to Kolesnikow's termination or were made or condoned by McNamara, Keeler or any

other HVHC employee involved in the decision to terminate her employment.  Further,

the alleged remarks do not even "evince a discriminatory state of mind," id. at 115,

because they do not reflect any assumptions or attitudes about older workers or

individuals of Polish national origin.  Therefore, the remarks are not at all probative of

whether the decision to terminate Kolesnikow's employment was motivated by

discriminatory intent.  See id. at 115-16; Witkowich v. Gonzales, 541 F. Supp. 2d 572,

585 (S.D.N.Y. 2008) (supervisor's remark that promotion process was a "beauty contest"

was not probative of age discrimination because, inter alia, it was "susceptible to any

number of benign meanings" and had no tendency to show any attitudes or assumptions

concerning age).

   **c.**  **The Evidence Concerning Nurses' Ages Does**
      **Not Give Rise to an Inference of Discrimination**

   Kolesnikow also argues that age discrimination can be inferred from the

fact that she was the oldest nursing assistant at the time of her termination; that shortly

after that time, in November 2004, the average age of nursing assistants in her unit was

38 years; and that nearly two years later, in July 2006, the average age of nursing

assistants in her unit was 37 years.  (Pltf. Br. at 4)  These statistics do not demonstrate a

bias against older employees, however.

        As an initial matter, it is not clear that Kolesnikow, at age 55, was the

oldest nursing assistant at HVHC.  Kolesnikow's exhibit concerning this issue (Pltf. Ex.

3) shows that in November 2004 another nursing assistant – Carmen Ortiz – was also 55.

There is no evidence demonstrating whether Ortiz or Kolesnikow is older.

        In any event, even if Kolesnikow were the oldest nursing assistant at the

time of her termination, that fact, standing alone, would not provide a sufficient basis to

infer that HVHC has a bias against older employees.  Hawkins v. Astor Home for

Children, No. 96-Civ.-8778(SS), 1998 WL 142134, at **7-8 (S.D.N.Y. Mar. 25, 1998)

(holding that the mere fact that plaintiff was the oldest employee at time of termination

did not give rise to inference of age discrimination);[13] Abdullah v. Skandinaviska

Enskilda Banken Corp., No. 98-Civ-7398(JSR), 1999 WL 945238, at *8 (S.D.N.Y. Oct.

19, 1999) (evidence that plaintiff was the only non-Caucasian employee over the age of

40 in his group was insufficient to give rise to inference of discrimination "in the absence

of any analysis of [that fact's] . . . statistical significance or of any comparative data

showing the demographics of the relevant labor pool"); Wado v. Xerox Corp., 991 F.

Supp. 174, 189 (W.D.N.Y. 1998) ("Plaintiff's age, standing alone, is insufficient to

satisfy his burden of proof. . . .  If it were [sufficient], any employer who terminated one

---

[13]  As noted in Hawkins, some courts have cited the plaintiff's status as the oldest
employee in explaining why the plaintiff's evidence was sufficient to give rise to an
inference of discrimination, but in those cases the plaintiff also offered other evidence of
discrimination.  Id. at *7.

of the oldest employees in any particular unit could be forced to litigate an ADEA claim

all the way to trial." (internal quotation omitted)).

    Similarly, the fact that the average age of the fourteen nursing assistants in

Kolesnikow's unit in November 2004 was 38, and that the average age had dropped to 37

by July 2006, is not probative of a bias against older employees.  "A statistical showing

of discrimination rests on the inherent improbability that the . . . [employer's] <u>decisions</u>

would conform to the observed pattern unless intentional discrimination was present."

Pollis v. New School for Social Research, 132 F.3d 115, 121 (2d Cir. 1997) (emphasis

added).  Thus, to give rise to an inference of discrimination based on the ages of HVHC's

employees, Kolesnikow would need to offer evidence concerning the decisions HVHC

made – e.g., she would need to offer evidence concerning HVHC's hiring decisions and

the age of applicants rejected by HVHC during the relevant time period.[14]  See also

Guider v. F.W. Woolworth Corp., No. 96-Civ.-3168(LAP), 1998 WL 702275, at *11

(S.D.N.Y. Oct. 7, 1998) (plaintiff's evidence concerning age of new hires did not support

inference of discrimination because, inter alia, plaintiff "ignor[ed] the ages of those

individuals who applied for the position").  Kolesnikow has offered no such evidence.

    Moreover, to the extent a jury could infer a change in average age based

on hiring decisions between November 2004 and 2006, the sample size – the nine

employees who appear on the list in 2006 but not in 2004, and who therefore were

presumably hired during that time period – is too small to support an inference that

HVAC made its decisions based on a bias against older workers.  See Fisher, 70 F.3d at

---

[14]  No inference can be drawn concerning HVHC employee departures, because the
evidence does not show why the employees who are not on the 2006 list left HVHC's
employment.

1451 (list of ages of employees considered for tenure, which showed that plaintiff was

oldest of eight such employees, was not "proof sufficient to support a finding of [age]

discrimination" because sample size was small and list did not "indicate[] that [the

employer] . . . had a policy or practice of denying tenure to older candidates"); Pollis, 132

F.3d at 121 (citing cases holding that a sample size of 13 to 15 decisions is too small to

give rise to an inference of discrimination as a matter of law, and explaining that "the

smaller the sample, . . . the less persuasive the inference of discrimination to be drawn

from it"); Gray v. Robert Plan Corp., 991 F. Supp. 94, 104 (E.D.N.Y. 1998) (even if it

were true that only one of approximately thirteen workers in plaintiff's unit was over the

age of 40, "the sample size of thirteen employees is too small to create an inference of

discrimination").[15]

* * *

Because no reasonable jury could find that HVHC terminated

Kolesnikow's employment because of her age or national origin, HVHC is entitled to

summary judgment on Kolesnikow's Title VII and ADEA claims.

## II.   PLAINTIFF'S CLAIMS FOR OVERTIME, VACATION AND SICK PAY

Kolesnikow also asserts federal and state claims for unpaid overtime and a

state claim for vacation and sick pay.  HVHC argues that Kolesnikow has been paid

_____

[15]  In addition, the one-year drop in the average age of nursing assistants between
November 2004 and July 2006 is too small to give rise to an inference that HVHC was
biased against older employees.  See Scelza v. North Fork Bank, 33 F. Supp. 2d 193, 202
(E.D.N.Y. 1999) (three-year drop in average age of employees was "negligible" and had
"no probative value" in age discrimination case); cf. Stratton v. Dep't for Aging for the
City of New York, 132 F.3d 869, 877 (2d Cir. 1997) (charts showing four-year drop in
average age of defendant's managerial employees were properly admitted as relevant to
plaintiff's age discrimination claim).

everything she is due.  (Def. Br. at 15-21)  For the reasons stated below, HVHC is

entitled to summary judgment as to Kolesnikow's overtime claims, but not as to her

claim for vacation and sick pay.

    **A.**      **Plaintiff's Unpaid Overtime Claim**

        **1.**      **Facts**

Kolesnikow was a part-time employee of HVAC from September 9, 2002

through February 2003.  (Def. Rule 56.1 Stat. ¶¶ 2, 20)  She became a full-time employee

on March 2, 2003.  (Id. ¶ 20)  As a full-time employee, she was regularly assigned to

work three twelve-hour shifts per week (from 7 a.m. to 7 p.m.).  (Id. ¶ 21)  However, the

documentary evidence indicates that Kolesnikow worked more than three shifts per week

approximately 25% of the time.  (See Pltf. Ex. 21) [16]

HVAC uses time sheets to record the hours worked by employees, and

requires its employees to sign in and out at the beginning and end of their shifts.  (Def.

Rule 56.1 Stat. ¶¶ 67, 75)  When an employee in the Brillinger Unit failed to record his or

her time, McNamara or another supervisor would fill in the time sheet on the employee's

behalf.  (Id. ¶¶ 78-79)

Kolesnikow was aware of the time sheet requirement and regularly signed

in and out.  (Id. ¶¶ 77)  However, Kolesnikow has testified that she was told by

McNamara to record her hours as 7:00 a.m. to 7:00 p.m. on each day's time sheet, even if

she had started earlier or worked late.  (Pltf. Dep. 360:22-361:17)  Another nursing

assistant testified that she regularly recorded both her start and end times in the morning,

---

[16]  The record contains time sheets for Kolesnikow covering the 98 weeks from
September 29, 2002 through August 14, 2004.  (Pltf. Ex. 21)  These time sheets indicate
that she worked more than three shifts in 24 of those weeks.  (Id.)

and although she "[s]ometimes" worked past the scheduled end of her shift, she did not change her time sheets to reflect the additional time.  (Walker Dep. 15:2-17:22)

Kolesnikow testified that McNamara told her that she should arrive early and that if she did so, she could help the nurses, but would not be paid for that time.  (Id. 361:18-363:9; see also Keeler Dep. 39:1-39:10 (testifying that if a nursing assistant arrived early and was ready to work, and saw a patient who needed assistance, the nursing assistant was expected to assist the patient))  For the first three or four months of Kolesnikow's employment, when she was a part-time employee, she started work fifteen to thirty minutes before 7:00 a.m.  (Id. 364:10-365:25)  However, she stopped coming in early because she was not being paid for that time.  (Id. 364:16-365:2)

If a nursing assistant was tending to a patient at the end of her shift, she was expected to finish the task even if it required her to work late.  (Keeler Dep. 43:17-44:6)  Kolesnikow worked past 7:00 p.m. two times per week, and sometimes more often.  (Pltf. Dep. 423:19-22)  Kolesnikow also "sometimes" worked through her half-hour lunch break.  (Pltf. Dep. 424:20-425:2)  This "sometimes" occurred once per week, and "sometimes" did not occur in a week.  (Id. 425:3-6)

Kolesnikow testified that she worked more than 40 hours per week two to four times a month throughout her employment, including twice per month when she was a part-time employee.  (Pltf. Dep. 358:24-359:10)  During her employment, she was paid for 171.75 hours of overtime at 1.5 times her regular rate of pay.  (Def. Rule 56.1 Stat. ¶ 70)  Kolesnikow did not keep any personal records of the hours that she worked.  (Id. ¶ 69)

2.        **Fair Labor Standards Act Overtime Claim**

It is undisputed that under the Fair Labor Standards Act ("FLSA"),

Kolesnikow was entitled to receive overtime pay at 1.5 times her regular rate for each

hour she worked in excess of 40 per week.  (See Def. Br. at 15-16)  To prevail on her

FLSA overtime claim, Kolesnikow has the burden of proving that she was not properly

paid for the time she actually worked.  Doo Nam Yang v. ACBL Corp., 427 F. Supp. 2d

327, 331 (S.D.N.Y. 2005).

"[W]here the employer's records [of the employee's hours and pay] are

inaccurate or inadequate and the employee cannot offer convincing substitutes," a

plaintiff can meet her burden by "prov[ing] that [s]he has in fact performed work for

which [s]he was improperly compensated and . . . produc[ing] sufficient evidence to

show the amount and extent of that work as a matter of just and reasonable inference."

Id. at 335 (internal quotation omitted).  If the plaintiff meets this burden, "[t]he burden

then shifts to the employer to come forward with evidence of the precise amount of work

performed or with evidence to negative the reasonableness of the inference to be drawn

from the employee's evidence."  Id. (internal quotation omitted).

The Court will assume for the purpose of deciding this motion that

HVHC's records were not accurate and that Kolesnikow may therefore meet her burden

by proving that she worked hours for which she was not compensated, and by

"produc[ing] sufficient evidence to show the amount and extent of that work as a matter

of just and reasonable inference."  Yang, 427 F. Supp. 2d at 335; Yu G. Ke v. Saigon

Grill, Inc., 595 F. Supp. 2d 240, 255 (S.D.N.Y. 2008) (same).  "To meet this burden, the

employee should not speculate, but [s]he may rely solely on . . . her recollection."  Park

31

v. Seoul Broadcasting Sys. Co., No. 05-Civ.-8956(BSJ), 2008 WL 619034, at *8

(S.D.N.Y. March 6, 2008); Yang, 427 F. Supp. 2d at 335 (same).

Kolesnikow's evidence concerning the hours she worked consists of her

testimony that:  (1) two to four weeks per month, she worked an unspecified amount of

time over 40 hours per week; (2) she "sometimes" worked through her half-hour lunch

break once per week; and (3) she worked an unspecified amount of time past the end of

her shift two or more times per week.  (See supra p. 30)  This evidence is insufficient to

defeat HVHC's summary judgment motion, for several reasons.

First, the only evidence concerning the amount of extra time Kolesnikow

worked each week is her testimony that she "sometimes" worked an extra half hour when

she worked through her lunch break.  (Pltf. Dep. 424:20-425:6)  She has not offered any

evidence concerning the amount of time she worked past the end of her shift, nor has she

offered any evidence concerning when she did so.  It is undisputed that Kolesnikow's

regular schedule called for 36 hours per week (not counting lunch breaks) (Def. Rule 56.1

Stat. ¶ 21), meaning that in most weeks, she could have worked at least four extra hours

per week before she exceeded 40 hours.[17]  Therefore, in the absence of evidence showing

the amount of extra time (beyond half an hour) that she worked each week, Kolesnikow's

testimony does not provide a sufficient basis to infer that she worked more than 40 hours

in any given week.  See Barry v. Town of Elma, No. 02-Civ.-344, 2005 WL 711842, at

*3 (W.D.N.Y. March 28, 2005) (summary judgment against plaintiff appropriate where

---

[17] Kolesnikow has also testified that she worked an extra 15 or 30 minutes in the
mornings when she was a part-time employee.  (Pltf. Dep. 364:10-365:25)  Because
Kolesnikow was scheduled to work even fewer than 36 hours during this time period, her
testimony that she worked an extra half hour or hour per week beyond her scheduled
hours is insufficient to show that she worked more than 40 hours in any given week.

plaintiff's regular schedule was 35 hours per week, and plaintiff testified that he was not compensated for extra time that he worked, but presented no "evidence showing how much overtime he purportedly worked in any given week").

Second, while Kolesnikow testified that she did in fact work more than 40 hours per week between two to four times per month (Pltf. Dep. 358:24-359:10), it is undisputed that she was paid for 171.75 hours of overtime during her employment at HVHC.  (Def. Rule 56.1 Stat. ¶ 70)  Therefore, in the absence of evidence demonstrating that Kolesnikow worked more than 171.75 hours of overtime during her employment at HVHC, there is no factual basis to infer that she worked overtime hours for which she was not paid.

Kolesnikow has not offered the "concrete particulars" that are required of a plaintiff in order to defeat a properly supported motion for summary judgment. Bickerstaff, 196 F.3d at 451-52.  She has not provided any factual basis to support a finding that she worked overtime hours for which she was not paid.  While there are cases in which FLSA plaintiffs have defeated summary judgment motions based on their own testimony, those plaintiffs have offered credible testimony approximating the number of hours they worked without pay.  See, e.g., Park, 2008 WL 619034, at *7 (plaintiff met initial burden by offering testimony concerning the number of extra hours he worked during specific time periods, and by offering co-worker testimony that both employees worked approximately 10 hours per day during an additional time period); Rivera v. Ndola Pharm. Corp., 497 F. Supp. 2d 381, 389-90 (E.D.N.Y. 2007) (plaintiff met initial burden by testifying that she worked 2.5 hours beyond the end of her eight-hour shift three times per week, and also worked for eight hours per day on four weekend

days per month, without additional compensation).  Kolesnikow has offered no such

proof.  Accordingly, HVHC is entitled to summary judgment on her claim for overtime

compensation under the FLSA.

### 3. New York Labor Law Overtime Claim

Kolesnikow's New York Labor Law overtime claim also fails.  Under the

Labor Law, an employer that "fails to keep adequate records . . . bear[s] the burden of

proving that the complaining employee was paid wages, benefits and wage supplements."

McKinney's Labor Law § 196-a; see also Yang, 427 F. Supp. 2d at 337 n.15 ("New York

law places the burden on the employer to show the employee was properly

compensated.").  Assuming that HVHC failed to keep adequate records, HVHC has

nonetheless met its burden by offering undisputed evidence that it paid Kolesnikow for

171.75 overtime hours.  (Def. Rule 56.1 Stat. ¶ 70)  As shown above, Kolesnikow has not

offered any factual basis to support a finding that she worked more than 171.75 overtime

hours.  Therefore, Defendants are also entitled to summary judgment on Kolesnikow's

New York Labor Law overtime claim.

### B. Plaintiff's Vacation and Sick Pay Claim

Kolesnikow claims that HVHC also violated the New York Labor Law by

failing to pay her for her accrued, unused vacation and sick time upon the termination of

her employment.  (Pltf. Br. at 15, 21-22)  Under the Labor Law, employers must "notify

. . . employees in writing or by publicly posting the employer's policy on sick leave,

vacation, personal leave, holidays and hours."  McKinney's Labor Law § 195(5).  An

employee's entitlement to receive payment for accrued, unused paid time off upon

termination of employment is governed by the terms of the employer's publicized policy.

See Gennes v. Yellow Book of New York, Inc., 23 A.D.3d 520, 522, 806 N.Y.S.2d 646,

648 (2d Dep't 2005) (holding that in an action to recover vacation pay under the New York Labor Law, "[t]he primary and dispositive issue . . . is whether there was any basis for the accrual of vacation benefits," and looking to employer's policy for terms of accrual); Glenville Gage Co., Inc. v. Indus. Bd. of Appeals, 70 A.D.2d 283, 284-85, 421 N.Y.S.2d 408, 409 (3d Dep't 1979) (stating that "the accrual of vacation [pay] . . . [is] a matter of agreement to provide such [a] benefit[]," and citing both the employer's written notice and the employee's testimony concerning the employer's custom in determining the terms of agreement).

Summary judgment is not appropriate where there is a genuine factual dispute as to whether, "pursuant to defendant's policies," the plaintiff forfeited her right to accrued, unused pay upon termination of employment.  Mahoney v. Olean Gen. Hosp., 277 A.D.2d 1046, 1046, 716 N.Y.S.2d 174, 175 (4th Dep't 2000).  HVHC argues that there can be no such dispute here, because the "Terminal Pay" policy in its employee handbook – which Kolesnikow undisputedly received (Def. Rule 56.1 Stat. ¶¶ 86-87) – gave Kolesnikow "clear[] . . . notice" that the only employees who would receive payment for accrued, unused vacation time upon termination were those who resigned voluntarily and gave appropriate notice.  (Def. Br. at 20-21)

The "Terminal Pay" provision on which HVHC relies states in full:

Terminal Pay – An employee who has completed six months continuous service as a regular full time or regular part time employee in the Hospital may be entitled to pro-rated terminal vacation pay provided that the employee gave advanced notice of resignation equal to the annual vacation benefit.  Failure to provide appropriate notice will result in loss of terminal vacation pay.

The Hospital will not pay any sick, vacation or personal time after the termination date which is the last day worked as a benefited employee.  Sick time and vacation days do

> not accrue in the last pay period of employment if the
> employee works less than the entire pay period.
>
> Personal days are not paid upon termination; they must be
> used or forfeited.
>
> During the notice period, the use of paid sick time requires
> a doctor's note to substantiate illness in order to be paid.

(Def. Rule 56.1 Stat. ¶¶ 86-88; Def. Ex. M; Pltf. Rule 56.1 Stat. ¶¶ 86-88; Pltf. Ex. 23)[18]

Although HVHC claims that this provision provides clear notice to involuntarily terminated employees such as Kolesnikow that they will not receive accrued vacation and sick pay, this Court does not agree.  This policy does not clearly state that employees will not be paid for accrued, unused vacation and sick time if they are involuntarily terminated.  Although the policy states that payment for "sick, vacation or personal time" will not be made "after the termination date," it leaves open the possibility that such a payment may be made on or before the termination date.  Although HVHC has offered evidence of other policies that provide support for its position that it never paid out accrued, unused sick time upon termination and that it did not pay out vacation time to employees terminated "for cause" (Def. Ex. N), there is no evidence in the record showing, for example, that Kolesnikow knew of these policies or that HVHC normally classified terminations such as Kolesnikow's as being "for cause."  Therefore, HVHC is not entitled to summary judgment on Kolesnikow's vacation and sick time claim.

---

[18]  Although Plaintiff denies the paragraph from Defendants' Rule 56.1 Statement that purports to quote HVHC's Terminal Pay policy, the evidence Plaintiff cites in doing so – Ex. 23 – contains the same language quoted by Defendants.  Therefore, the Court concludes that the language of the "Terminal Pay" policy contained in the handbook is not in dispute.

### III.     PLAINTIFF'S TORT CLAIMS

Kolesnikow asserts claims under New York state law against both defendants for assault and battery and intentional infliction of emotional distress, "based on McNamara forcibly grabbing [her] and pulling her into an unlit bathroom" to discuss the food tray incident on August 2, 2004.  (Pltf. Br. at 23)  Defendants argue that these claims are time-barred because Kolesnikow failed to bring suit within the one-year statute of limitations for such claims.  (Def. Br. at 22)  Kolesnikow argues that the statute of limitations was tolled while her complaint to the New York State Department of Human Rights was pending, as Magistrate Judge Yanthis held in granting an earlier motion by Kolesnikow to amend her complaint.  (Pltf. Br. at 22)  She further argues that the Court may not consider Defendants' statute of limitations defense because they did not object to Magistrate Judge Yanthis's decision until they filed the instant summary judgment motion – ten months after Judge Yanthis's decision.  (Pltf. Br. at 22; July 13, 2006 Mem. Op. and Order (Docket No. 20) at 3)

Where a magistrate judge's ruling on a non-dispositive motion is dispositive of a defense, and there is no timely objection, this Court reviews the decision for clear error rather than deeming the defendants to have waived their objection.  See In re Bulk Oil (USA) Inc., No. 89-B-13380, 93-Civ.-4492(PKL), 93-Civ.-4494(PKL), 2007 WL 1121739, *4 (S.D.N.Y. Apr. 11, 2007) (where magistrate judge denied leave to amend complaint on ground that amendment was futile, and plaintiff failed to raise timely objection, plaintiff would not be held to have waived the claims at issue, but "clear error" standard of review would apply).  The Court will find clear error only if it "is left with the definite and firm conviction that a mistake has been committed."  Id. at *5 (internal quotation omitted).  This Court has such a conviction, because the overwhelming

majority of courts in this District have held that no tolling should apply in the circumstances here.

In his decision, Magistrate Judge Yanthis explained that "[d]istrict courts within the Second Circuit have disagreed about whether state intentional tort claims are tolled while a plaintiff's administrative charge is pending," and that "the Second Circuit has not addressed the issue." (Op. at 2) He found the decisions in favor of tolling more persuasive on the ground that such a rule "avoid[s] duplicative litigation and judicial inefficiency," because the plaintiff need not rush to court on her state tort claims while exhausting the administrative remedies applicable to her discrimination claims. (Id. at 2-3)

While this reasoning has some appeal, "the vast majority" of courts in this District have held that the statute of limitations for state tort claims is not tolled during the pendency of an administrative discrimination charge. Pasqualini v. MortgageIT, Inc., 498 F. Supp. 2d 659, 668 (S.D.N.Y. 2007) (holding that statute of limitations applicable to plaintiff's intentional infliction of emotional distress and assault and battery claims was not tolled during the pendency of his EEOC charge); see also Gardner v. St. Bonaventure Univ., 171 F. Supp. 2d 118, 129 (W.D.N.Y. 2001) ("[t]he weight of authority" among district courts in the Second Circuit and in other Circuits "is against tolling state [tort] claims during the pendency of the [administrative charge]").[19]

---

[19]  See also, e.g., Hargett v. Met. Transit Auth., 552 F. Supp. 2d 393, 399-401 (S.D.N.Y. 2008) (statute of limitations for intentional infliction of emotional distress claim was not tolled during pendency of EEOC charge); Smalls v. Allstate Ins. Co., 396 F. Supp. 2d 364, 375 (S.D.N.Y. 2005) (statute of limitations for intentional infliction of emotional distress claim was not tolled during pendency of discrimination charge before the New York State Department of Human Rights); Callahan v. Image Bank, 184 F. Supp. 2d 362,

     In so holding, courts have followed the reasoning of <u>Johnson v. Railway Express Agency, Inc.</u>, 421 U.S. 454 (1975), in which the Supreme Court held that a plaintiff's time to file a discrimination claim under 42 U.S.C. § 1981, which is governed by the applicable state law statute of limitations, is not tolled during the pendency of an EEOC charge relating to the same discrimination claim.  <u>Id.</u> at 457, 467.  In reaching that result, the Court rejected the argument that tolling is necessary in order to achieve the goals of Title VII – which requires plaintiffs to engage in an "administrative conciliation process" by first filing their claims with the EEOC – finding "no policy reason that excuses . . . [a plaintiff's] failure to take the minimal steps necessary to preserve each . . . [of his] claim[s] independently."  <u>Id.</u> at 465-66.

     Although the Second Circuit has not addressed <u>Johnson</u>'s applicability to state law tort claims such as Kolesnikow's, the circuit courts that have done so have held

---

363 (S.D.N.Y. 2002) (statute of limitations for intentional infliction of emotional distress claim was not tolled during pendency of EEOC charge); <u>Duran v. Jamaica Hosp.</u>, 216 F. Supp. 2d 63, 67-68 (E.D.N.Y. 2002) (statute of limitations for slander claim was not tolled during pendency of EEOC charge); <u>Abdallah v. City of New York</u>, No. 95-Civ.-9427(MGC), 2001 WL 262709, at *6 (S.D.N.Y. Mar. 16, 2001) (statute of limitations for intentional infliction of emotional distress claim was not tolled during pendency of EEOC charge); <u>Tovar v. KLM Royal Dutch Airlines</u>, No. 98-Civ.-5178(LAP), 2000 WL 1273841, at *3 (S.D.N.Y. 2000) (statute of limitations for intentional infliction of emotional distress claim was not tolled during pendency of EEOC charge); <u>Stordeur v. Computer Assoc. Int'l, Inc.</u>, 995 F. Supp. 94, 99-102 (E.D.N.Y. 1998) (statute of limitations for "intentional infliction of extreme emotional distress" and slander claims was not tolled during pendency of EEOC charge); <u>Gray v. Shearson Lehman Bros., Inc.</u>, 947 F. Supp. 132, 137 (S.D.N.Y. 1996) (holding that statute of limitations for state law whistleblower claim was not tolled during pendency of discrimination charge before the state Department of Human Rights and the EEOC); <u>Ashjari v. NYNEX Corp.</u>, No. 93-Civ.-0751(RPP), 1998 WL 699520, at *1 (S.D.N.Y. Oct. 2, 1998) (dismissing <u>pro se</u> employment discrimination plaintiff's assault and battery claims as untimely), <u>aff'd</u>, 182 F.3d 898 (table op.), 1999 WL 464977, at *1 (2d Cir. June 22, 1999) (citing <u>Johnson v. Railway Express Agency, Inc.</u>, 421 U.S. 454 (1975), for the proposition that "an EEOC charge does not toll the time for state law claims arising from the same events").

that the statute of limitations is not tolled with respect to such claims.  Juarez v.
Ameritech Mobile Commc'ns, Inc., 957 F.2d 317, 322-23 (7th Cir. 1992) (statute of
limitations for plaintiff's state law privacy claims was not tolled during pendency of
EEOC charge (citing Johnson)); Arnold v. United States, 816 F.2d 1306, 1312-13 (9th
Cir. 1987) (statute of limitations for plaintiff's state law claims of assault, battery and
intentional infliction of emotional distress was not tolled during pendency of EEOC
charge because tolling was not available under state law (citing Johnson)).

   It appears that only three district court decisions in the Second Circuit
reached a contrary result.  In those cases, which all date from the 1990s, the courts'
holdings were based on considerations of judicial efficiency and the concern that a rule
against tolling would "undermine the purposes of Title VII."  Brown v. Bronx Cross
County Med. Group, 834 F. Supp. 105, 111 (S.D.N.Y. 1993).   However, these decisions
do not discuss Johnson, which rejected those considerations in analogous circumstances.
See Brown, 834 F. Supp. at 111 (not discussing Johnson or citing any case law in support
of holding that statute of limitations for plaintiff's claim for intentional infliction of
emotional distress was tolled during pendency of EEOC charge); Anderson v. Yarp Rest.,
Inc., No. 94-Civ.-7543(CSH), 1996 WL 271891, at **2-4 (S.D.N.Y. May 21, 1996) (not
discussing Johnson); Forbes v. Merrill Lynch, Fenner & Smith, Inc., 957 F. Supp. 450,
455-56 (S.D.N.Y. 1997) (same).

   Because the weight of authority in this District overwhelmingly supports
holding that Kolesnikow's state law tort claims are time-barred, and because the contrary
authority does not take into consideration applicable Supreme Court precedent, the Court

finds that Magistrate Judge Yanthis's decision was clearly in error and that Kolesnikow's state law tort claims should be dismissed as time-barred.

## IV.     SUPPLEMENTAL JURISDICTION

Because the Court has determined that Kolesnikow's federal claims must be dismissed, the Court "must reassess its jurisdiction over the case by considering several related factors – judicial economy, convenience, fairness, and comity." Motorola Credit Corp. v. Uzan, 388 F.3d 39, 56 (2d Cir. 2004).  The Second Circuit has stated that "when the dismissal of the federal claim[s] occurs late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair" and "is . . .by [no] . . .means necessary." Id. (internal quotations omitted).  This Court will continue to exercise supplemental jurisdiction over Kolesnikow's sole remaining claim – for vacation and sick pay under the New York Labor Law – because this action has been pending in this Court for more than three years, has been litigated through discovery and dispositive motions, and is ready to proceed to trial.  Cf. Amtex Fabrics, Inc. v. Just In Materials, Inc., 140 F.3d 101, 105 (2d Cir. 1998) (district court did not abuse discretion by exercising supplemental jurisdiction over state law claims after discovery was complete and parties had settled the jurisdiction-conferring claim).

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment

(Docket No. 37) is DENIED with respect to Plaintiff's New York Labor Law claim for

vacation and sick pay and is otherwise GRANTED. Because the sole remaining claim is

against HVHC, Defendant McNamara is hereby dismissed from this action.

Dated: New York, New York
     May 19, 2009

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

42